AVETA INC., MMM Holdings, Inc., and Preferred Medicare Choice, Inc., Plaintiffs,

v.

Roberto Bengoa CAVALLIERI, Ramon F. Echeandia Velez, Luis R. Romero Lopez, Oscar Hernandez Lopez, Sonia Cruz Miranda, Fernando Echeandia Fuster, Efrain Torres Castro, Angel B. Malave, Juan R. Iturregui Pagan,

17. *Id.* at 743.

18. *Id.*

19. *Id.* at 743 n. 4.

20. *See id.* at 743.

21. *See id.* at 743 n. 4.

22. *See id.* at 743.

Confesor Lasalle Ruiz, Elvin Vigo Paredes, Juan A. Perez Vazquez, Nestor A. Perez, Ramon Echeandia Fuster, Evaristo Quinones, Jose Allende, Jorge Padilla Rodriguez, Luis Rosa Toledo, Mario O. Velez Gonzalez, Elba Velazquez Fraticelli, Maria A. Amezquita, Carlos Lugo Olivieri, Antonio Marerro, Antonio Gonzalez, and Victor L. Delgado Colon, Defendants.

C.A. No. 5074–VCL.

Court of Chancery of Delaware.

Submitted: June 30, 2010.
Decided: Sept. 20, 2010.

Richard L. Horwitz, Brian C. Ralston, Berton W. Ashman, Ryan W. Browning, Potter Anderson & Corroon LLP, Wilmington, Delaware; Andrew J. Frackman, Kenneth Murata, Peter C. Herrick, O'Melveny & Myers LLP, New York, New York; Attorneys for Plaintiffs Aveta Inc., MMM Holdings, Inc., and Preferred Medicare Choice, Inc.

Michael A. Weidinger, Patricia R. Uhlenbrock, Pinckney, Harris & Weidinger, LLC, Wilmington, Delaware; Attorneys for Defendants Roberto Bengoa Cavallieri, Ramon F. Echeandia Velez, Luis R. Romero Lopez, Oscar Hernandez Lopez, Sonia Cruz Miranda, Fernando Echeandia Fuster, Efrain Torres Castro, Angel B. Malave, Juan R. Iturregui Pagan, Confesor Lasalle Ruiz, Elvin Vigo Paredes, Juan A. Perez Vazquez, Nestor A. Perez, Ramon Echeandia Fuster, Evaristo Quinones, Jose Allende, Jorge Padilla Rodriguez, Luis Rosa Toledo, Mario O. Velez Gonzalez, Elba Velazquez Fraticelli, Maria A. Amezquita, Carlos Lugo Olivieri, Antonio Marerro, Antonio Gonzalez, and Victor L. Delgado Colon.

## OPINION

LASTER, Vice Chancellor.

In 2006, Aveta Inc. closed the acquisition of Preferred Medicare Choice Inc. ("PMC"), a Puerto Rico corporation. Aveta purchased PMC's Class A shares from its controlling shareholders for 60.93% of the aggregate consideration, then merged a Puerto Rico acquisition subsidiary into PMC. PMC's non-controlling Class B shares were converted into the right to receive the remaining 39.07% of the consideration. Part of the consideration was paid at closing, subject to post-closing adjustments, with the potential for an earn-out. Aveta would calculate the adjustments and earn-out, then attempt to reach agreement with Roberto L. Bengoa, who was designated in the transaction agreement as the "Shareholders' Representative." If they agreed, then payments would be made using their calculations. If not, then Ernst & Young LLP ("E & Y") would resolve any disputes and make the determinations.

In June 2007, some 110 former PMC shareholders purported to revoke Bengoa's

authority as Shareholders' Representative. Twenty-five former PMC shareholders have attempted to litigate the consideration and related issues in Puerto Rico. The Puerto Rico litigation has been stayed pending the outcome of this proceeding.

The central question in this case is whether the contractual process for calculating the consideration, including the outcome of the E & Y arbitration, binds all former PMC shareholders. The parties have cross moved for summary judgment.

The controlling and non-controlling shareholders are differently situated. The controlling shareholders signed the transaction agreement and bound themselves to its terms. As to them, agency law controls. They appointed Bengoa irrevocably as their representative and selected Delaware law to govern the relationship. They are bound by Bengoa's acts.

None of the non-controlling shareholders signed the transaction agreement. They also did not vote in favor of the transaction, which was approved using the Class A shares' voting power. They are nevertheless bound as a matter of corporate law. The Puerto Rico statute governing the merger tracks the pre–1996 version of 8 *Del C.* § 251. As the statute contemplates, the transaction agreement clearly and expressly provided for the merger consideration to depend on facts ascertainable outside the agreement. The result applies to all of the Class B shares that were converted into a right to receive the merger consideration. The non-controlling shareholders, all of whom held Class B shares, consequently are bound irrespective of agency law.

The defendants also seek to evade the contractual procedures in the transaction agreement by citing a term sheet executed by Aveta and Bengoa while they were disputing the post-closing adjustments and earn-out. *Res judicata* bars the controlling shareholders from relying on the term sheet. *Stare decisis* prevents the non-controlling shareholders from doing so.

Finally, by asserting claims in Puerto Rico that depended on the transaction agreement, the defendants breached the agreement's exclusive Delaware forum selection clause. Aveta's motion for summary judgment is granted, and the defendants' motion is denied.

## I. FACTUAL BACKGROUND

The factual record consists of affidavits and documents submitted by the parties. I take judicial notice of filings in related litigation in the courts of this State and the Commonwealth of Puerto Rico. The parties dispute the factual underpinnings for applying agency law to the non-controlling shareholders, but I do not reach those issues. There are no material factual disputes about the corporate transactions or the controlling stockholders' execution of the transaction agreement.

### A. Aveta Acquires PMC.

Plaintiff Aveta, a Delaware corporation, is a health insurance company that specializes in building provider networks and management service organizations. Plaintiff MMM Holdings, Inc., also a Delaware corporation, is a subsidiary through which Aveta owns business interests in Puerto Rico. I refer to the two entities together as "Aveta." Plaintiff PMC, a Puerto Rico corporation, operates a provider network of doctors and other health professionals on the island.

Aveta acquired PMC pursuant to an Agreement and Plan of Merger and Stock Purchase, by and among MMM Holdings, Inc., PMC Holdings, Inc., Preferred Medicare Choice, Inc., BER Health Partners Group, Inc. ("BER"), and certain stockholders of Preferred Medicare Choice and

BER, dated as of May 4, 2006 (the "Purchase Agreement" or "PA"). As suggested by the document's lengthy name, the underlying transaction involved both a purchase of shares and a merger (together, the "Transaction").

At the time of the Transaction, PMC had two classes of shares: Class A and Class B. Class A shares comprised 51% of PMC's issued and outstanding stock. Class B shares comprised the remaining 49%.

The Class A shares were owned by BER, a holding company. All of BER's shares were owned by a control group consisting of Bengoa, his father Roberto Bengoa Cavallieri ("Bengoa, Sr."), Ramon F. Echeandia Velez, and Luis R. Romero Lopez. The Purchase Agreement referred to these individuals collectively as the "Principal Shareholders." BER and each of the Principal Shareholders signed the Purchase Agreement.

The Class B shares were owned by over 100 individuals; many (if not all) were the doctors and other health professionals who made up PMC's provider network. The Class B shareholders did not sign the Purchase Agreement and did not vote on the transactions it contemplated.

The named defendants in the current action (the "Shareholder Defendants") commenced litigation in Puerto Rico against Aveta. Three of the Shareholder Defendants were Principal Shareholders: Bengoa, Sr., Ramon F. Echeandia Velez, and Luis R. Romero Lopez (the "Principal Shareholder Defendants"). The remaining Shareholder Defendants were Class B shareholders (the "Class B Defendants").

## B. The Structure Of The Transaction

In the Transaction, MMM first purchased all of BER's equity from the Principal Shareholders in return for 60.93% of the total "Transaction Consideration," a term defined in the Purchase Agreement. By purchasing all of BER's equity, MMM gained sole ownership of the entity that held all of PMC's Class A shares. MMM next contributed to BER all of the common stock of PMC Holdings, a newly formed Puerto Rico corporation. In this fashion, PMC Holdings became a wholly owned subsidiary of BER, which at that point was a wholly owned subsidiary of MMM.

MMM, BER, and the Principal Shareholders then approved the merger of PMC Holdings with and into PMC. In the merger, PMC's Class A shares were cancelled, PMC's Class B shares were converted into the right to receive 39.07% of the Transaction Consideration, and the shares of PMC Holdings were converted into shares of PMC.

Aveta emerged from the Transaction with its subsidiary MMM owning 100% of BER, which in turn owned 100% of PMC. As a result of the share purchase, the Principal Shareholders had a right to 60.93% of the Transaction Consideration. As a result of the merger, the Class B Shareholders had a right to 39.07% of the Transaction Consideration.

## C. The Determination Of The Transaction Consideration

The Transaction Consideration had several components. At closing, Aveta paid $157 million in cash. PA § 2.1. The Transaction Agreement contemplated potential earn-out payments for 2006 and 2007, depending on PMC's performance. PA § 2.2 (the "Earn–Out Payments"). The Transaction Agreement also provided for post-closing adjustments to the Transaction Consideration. One adjustment accounted for the level of PMC's working capital at closing. PA § 2.5 (the "Working Capital Adjustment"). Another accounted for

PMC's actual claims experience for liabilities "Incurred But Not Recorded" at closing. PA § 2.3 (the "IBNR Adjustment"). I refer to the Earn–Out Payments, Working Capital Adjustment, and IBNR Adjustment collectively as the "Post–Closing Adjustments."

The Purchase Agreement established mechanisms for calculating the Post–Closing Adjustments. Generally speaking, by a given target date, Aveta would determine the respective amount from PMC's books and records, then provide its determination and the supporting books and records to the Shareholders' Representative for review. The Purchase Agreement designated Bengoa as the Shareholders' Representative:

> [T]he Principal Shareholders and each of the other Shareholders signing this Agreement hereby irrevocably designate Roberto L. Bengoa ... as their representative, agent and attorney-in-fact (the "Shareholders' Representative") to execute any and all instruments or other documents on behalf of ... the Principal Shareholders and such other Shareholders[,] to do any and all other acts or things on behalf of ... the Shareholders which the Shareholders' Representative may deem necessary or advisable, or which may be required pursuant to this Agreement or otherwise, in connection with the consummation of the BER Sale, the Merger and the other transactions contemplated herein.

PA § 13.2. Bengoa had twenty days to object to Aveta's calculation. If he did not, or if Aveta and Bengoa resolved the objections, then the result would be final and binding. If the Aveta and Bengoa could not agree, then their disputes would be resolved by E & Y, whose determination would be final and binding.[1]

## D. The Parties Disagree Over The Post–Closing Adjustments.

After closing, Aveta provided Bengoa with its determinations for the respective Post–Closing Adjustments. Bengoa raised objections, and the two sides could not reach agreement. During the course of exploring potential resolutions, Aveta and Bengoa executed a document entitled "Total Proposal for PMC/PHM Business and Equity Incentive/Medical Management Programs" (the "Total Proposal").

The Total Proposal was not a final and binding agreement. It was a three-page term sheet that described a framework for potentially resolving disputes and moving forward. Item 1 stated "[s]ettlement of all current and potential claims [with respect to] PMC acquisition." Item 6 stated "[s]ettlement is all or nothing; will be documented in January with formal agreements." No formal agreements were ever executed.

The Total Proposal also was not a free-standing agreement. Two items facially referred to and depended on sections of the Purchase Agreement. The first, Item 4, was entitled "Restructuring of PMC Earn Out" and contained eight subparts. Standing alone, Item 4 did not spell out any type of formula for an earn-out. It referred back to the Purchase Agreement and provided different inputs for the formulas found there. The second item, consisting of bulleted language appearing after Item 4, referred back to a balance sheet adjustment contemplated by Section 2.4 of the Purchase Agreement. It also did not provide a free-standing formula,

---

1. For lengthier descriptions of the Post–Closing Adjustments, see *Aveta Inc. v. Bengoa*, 986 A.2d 1166, 1172–74 (Del.Ch.2009) (the "Contempt Decision"), and *Aveta Inc. v. Bengoa*, 2008 WL 5255818, *2–3 (Del.Ch. Dec. 11, 2008) (the "Arbitration Decision").

and without consulting Section 2.4, the language made no sense.

After the Total Proposal was executed, Aveta and Bengoa continued to discuss potential resolutions. On January 17, 2007, Bengoa proposed different terms. The parties continued to negotiate, and on May 11, 2007, Bengoa wrote that, "in a final effort to solve this I am willing to change my last proposal (12/2006) as follow [sic]."

During the negotiations, Aveta and Bengoa kicked off the arbitration procedure. On March 27, 2007, Aveta and Bengoa executed an agreement designating E & Y to serve as arbitrator. But after that, Bengoa refused to proceed any further, claiming he had not been provided with the necessary materials to participate productively in the process. For nearly a year, without success, Aveta tried to satisfy Bengoa's requests and get the arbitration under way.

### E. The Lugo Delaware Action

Meanwhile, by letter dated June 8, 2007, a group calling itself the Advisory Committee of Former Stockholders of Preferred Medicare Choice, Inc. purported to revoke Bengoa's designation as Shareholders' Representative and claimed he had no authority to represent them. The letter purportedly was sent on behalf of 110 former PMC shareholders.

In late 2007, two of the shareholders—Carlos Lugo Olivieri ("Lugo") and Antonio Marrero—disputed the calculation of the Post–Closing Adjustments. After they threatened to file suit in Puerto Rico, Aveta sought a declaratory judgment from the Delaware Superior Court (the "Lugo Delaware Action"). The Purchase Agreement contains a broad forum selection clause mandating that any action "arising out of or relating to" the Purchase Agreement be brought exclusively in a Delaware court.

PA § 13.4. Notwithstanding the filing of the Lugo Delaware Action and the forum selection clause, Lugo, Marrero, and two other shareholders filed a lawsuit against Aveta in Puerto Rico (the "Lugo Puerto Rico Action"). They alleged that the Total Proposal novated the Purchase Agreement and sought specific performance of the Total Proposal.

Soon thereafter, in February 2008, Lugo and Marrero moved to dismiss the Lugo Delaware Action on the grounds that the Total Proposal was the operative contract. Because the Total Proposal lacked any forum selection clause, they contended that the Superior Court could not exercise jurisdiction. The Superior Court denied the motion. *Aveta Inc. v. Olivieri*, 2008 WL 4147565, at *2 (Del.Super.Ct. July 28, 2008). The case was later stayed by agreement of the parties.

### F. This Court Issues The Arbitration Decision.

On March 6, 2008, Aveta delivered a notice of intent to arbitrate to Bengoa. On the same day, Aveta sued Bengoa in this Court to compel him to arbitrate. *See* Verified Complaint, C.A. No. 3598–VCL (the "Arbitration Action"). Vice Chancellor Lamb granted Aveta's motion for judgment on the pleadings. Arbitration Decision, 2008 WL 5255818 at *4. He ordered Bengoa "to proceed to arbitration in accordance with the Agreement and Plan of Merger and Stock Purchase." *Aveta Inc. v. Bengoa*, C.A. No. 3598–VCL, 2008 WL 5255818 (Del.Ch. Dec. 11, 2008) (ORDER). Bengoa did not appeal, and the order became final.

### G. Aveta Seeks To Enforce The Arbitration Decision.

For ten months after the Arbitration Decision, Aveta attempted to proceed with

the arbitration. Bengoa obstructed that process. *See* Contempt Decision, 986 A.2d at 1178–79 (describing Bengoa's conduct).

On September 21, 2009, Aveta moved to enforce the Arbitration Decision. In response, Bengoa argued for the first time that the Total Proposal novated the Purchase He contended that because the Total Proposal did not contain an arbitration clause, and because the Total Proposal replaced and superseded the Purchase Agreement, he had no duty to arbitrate. Bengoa conceded that if he made this argument successfully before Vice Chancellor Lamb, it would have obviated the grounds for the Arbitration Decision.

Shortly after Aveta moved to enforce the Arbitration Decision, twenty-one other former PMC shareholders filed a second action in Puerto Rico. Like the Lugo Puerto Rico Action, their lawsuit challenged Aveta's calculation of the Post–Closing Adjustments, alleged that the Total Proposal novated the Purchase Agreement, and sought to enforce the Total Proposal.

In response to these developments, Aveta moved to amend its complaint in the Arbitration Action to add as defendants all of the plaintiffs in the two Puerto Rico actions. I denied the motion to amend because the Arbitration Decision had long ago become a final order. Aveta then filed this action. As noted, the Puerto Rico actions have been stayed pending the outcome of this proceeding.

## II. LEGAL ANALYSIS

■ Summary judgment may be granted when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ct. Ch. R. 56(c). "[T]he moving party bears the burden of demonstrating both the absence of a material issue of fact and entitlement to judgment as a matter of law. . . ." *913 N. Mkt. St. P'ship, L.P. v.*

*Davis,* 723 A.2d 397, 397 (Del.1998). If the moving party makes this showing, the nonmovant may avoid summary judgment only by setting forth specific facts demonstrating that there is a genuine issue for trial. Ct. Ch. R. 56(e). "If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." *Id.*

### A. The Shareholder Defendants Are Bound.

The Shareholder Defendants are bound by the determinations made in the Post–Closing Adjustment process, including the results of the E & Y arbitration. The Principal Shareholder Defendants are bound as a matter of agency law. The Class B Defendants are bound as a matter of corporate law.

### 1. Choice of Law

■ The parties to the Purchase Agreement opted for their obligations to be governed by a mixture of Delaware and Puerto Rico law. The Purchase Agreement provides that "[t]his Agreement will be governed by and construed in accordance with the internal laws of the State of Delaware applicable to agreements made and to be performed entirely within such State, without regard to the conflicts of law principles that would require the application of any other law." PA § 13.3. The Purchase Agreement is therefore governed by Delaware law "as to its contractual terms." *In re IBP, Inc. S'holders Litig.,* 2001 WL 406292, at *10 (Del.Ch. Apr. 18, 2001). Delaware law governs, among other issues, (i) Aveta's purchase of BER's equity from the Principal Shareholders in return for 60.93% of the Transaction Consideration, (ii) the Principal Shareholders irrevocable designation of Bengoa as their agent for purposes of the Post–Closing Adjustments,

and (iii) the binding effect of Bengoa's actions and determinations.

■ The merger of PMC Holdings into PMC, however, was a merger between two Puerto Rico corporations. "The internal affairs doctrine requires that the law of the state of incorporation should determine issues relating to internal corporate affairs." *McDermott Inc. v. Lewis*, 531 A.2d 206, 215 (Del.1987). The implementation and effectiveness of a merger between two corporations from the same jurisdiction is an internal corporate matter to be governed by the law of that jurisdiction. *See IBP*, 2001 WL 406292, at *10 (explaining that, despite selection of New York law in merger agreement, underlying merger was governed by Delaware law because "all of the parties to the Merger Agreement have chosen Delaware as their state of incorporation"); *cf. TC Inv., Corp. v. Becker*, 2010 WL 2593525, at *11 (D.P.R. June 28, 2010) (following internal affairs doctrine and applying Delaware law to Delaware limited liability company). Under the internal affairs doctrine, the law of Puerto Rico governs the corporate mechanics of the merger, including the conversion of the Class B shares into the right to receive 39.07% of the Transaction Consideration.

### 2. The Principal Shareholder Defendants

The Principal Shareholders are bound by Bengoa's actions because they irrevocably appointed Bengoa as their agent pursuant to Section 13.2 of the Purchase Agreement, which each of the Principal Shareholders' signed. The grant of irrevocable authority to the Shareholders' Representative was legally effective under Delaware law.

■ "Most agency powers are, of course, terminable by the grantor of the power at will. Irrevocable powers ... are

an exception." *Haft v. Haft*, 671 A.2d 413, 420 (Del.Ch.1995) (Allen, C). A grant of authority will be upheld as irrevocable when it is "coupled with an interest...." 12 Richard A. Lord, *Williston on Contracts* § 35:32 (4th ed.2010); *see* 3 Am. Jur.2d *Agency* § 60 (2010) ("If the authority or power of an agent is coupled with an interest, it is not revocable by the act, condition, or death of the principal before the expiration of the interest."). Generally speaking, the recipient of the power must possess authority over or an interest in the subject matter of the agency that exists independent of the agency relationship. Conversely, if the agent only has authority to act and an interest in doing so because of his role as agent, then the agent's authority is not "coupled with an interest."

■ A creditor's interest in a debt is one example of an interest sufficient to support an irrevocable grant of authority, and the law will specifically enforce, for example, the borrower's irrevocable grant of authority to the creditor to act as the borrower's agent in disposing of collateral securing the debt. Restatement (Third) of Agency § 3.12 (2006). The creditor's interest in the debt and his right to the collateral in the event of default exist whether or not the creditor is given authority to act as the borrower's agent. The creditor's interests contrast with a third party whom the borrower might hire to sell the collateral. But for the authority granted via agency, the third party lacks any interest in the collateral or authority over it. Even if styled as an irrevocable agency, the grant of authority to the third party could be terminated. *Compare id.* at Illus. 1, 2 & 5 *with id.* at Illus. 3 & 4.

■ Delaware has addressed irrevocability primarily in the context of grants of proxy authority, which is a specific type of agency relationship. *Moran v. Household*

*Int'l, Inc.,* 500 A.2d 1346, 1355 (Del.1985); *see* 2 David A. Drexler et al. *Delaware Corporation Law and Practice* § 25.09[2] (2009) ("[A] proxy is the creation of an agency...."). Consistent with the common law rule, Section 212(e) of the General Corporation Law states: "A duly executed proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power. A proxy may be made irrevocable regardless of whether the interest with which it is coupled is an interest in the stock itself or an interest in the corporation generally." 8 *Del. C.* § 212(e). Interpreting Section 212(e), Chancellor Allen held that a CEO's interest in his position as a senior executive officer of the corporation was sufficient to support an irrevocable proxy to vote a majority of the corporation's voting power. *Haft,* 671 A.2d at 422–23. Although Chancellor Allen expressed concern about the wisdom of using an irrevocable proxy to separate voting control from equity ownership, *id.,* he concluded the result was compelled by the second sentence of Section 212(e) and consistent with precedents from other jurisdictions, *id.* at 420–21. Framed in terms of agency, the CEO's position as a senior officer of the corporation gave him authority over and an interest in the corporation that existed independent of the agency relationship created by the proxy. The proxy was thus "coupled with an interest" sufficient to make it irrevocable.

■ Under these principles, Bengoa's authority was coupled with an interest sufficient to make it irrevocable. Like the other Principal Shareholders, Bengoa formerly owned part of the equity of BER and was a member of the group that controlled PMC. As a result of MMM's purchase of BER's equity, Bengoa became entitled to his share of the 60.93% of the Transaction Consideration allocated to the Principal Stockholders. Regardless of the grant of authority under Section 13.2, Bengoa had an interest in PMC, the Purchase Agreement, and the determination of the Transaction Consideration. Bengoa's interests in those matters gave him standing to enforce a right to his share of the Transaction Consideration independent of the grant of authority in Section 13.2. The other Principal Shareholders therefore could and did confer irrevocable authority on Bengoa to pursue their comparable interests.

A separate and independent basis for validating the grant of irrevocable authority flows from *Abercrombie v. Davies,* 123 A.2d 893 (Del.Ch.1956), *rev'd on other grounds,* 130 A.2d 338 (Del.1957). There, six stockholders who held a majority of the corporation's voting power created a complex arrangement in which they placed their shares in escrow and granted irrevocable proxies to their agents to vote their shares. *Id.* at 896. The stockholders agreed to a dispute-resolution mechanism so that all the shares always would be voted as a block. *Id.* at 897. Chancellor Seitz held that irrevocability of the grant of authority was essential to the functioning of the interrelated provisions of the agreement, and that each of the parties relied on the irrevocability of the grant of authority in entering into the agreement and subsequently investing funds. *Id.* at 906–07. "Where there is a legal agreement between stockholders, as opposed to a mere principal-agent situation, I believe the parties may agree to and be bound by a provision by which they commit themselves to keep an irrevocable proxy in effect in order that the so-called 'arbitration' provisions of the Agreement may be implemented. This is particularly true where a strong element of reliance is involved."

*Id.* at 906.[2]

■ The principles outlined in *Abercrombie* apply here. The Purchase Agreement was a binding legal agreement executed by the Principal Shareholders. The Principal Shareholders appointed Bengoa as the Shareholders' Representative for purposes of carrying out the Post–Closing Adjustments. Aveta bargained for the right to rely on Bengoa. In reliance on that right, Aveta closed on the acquisition, paid out $157 million in cash at closing, and committed potentially to pay more. The relationship between the Principal Shareholders and Bengoa went beyond a basic principal-agent relationship and implicated Aveta's reliance interests.

Vice Chancellor Strine's ruling in *Ballenger v. Applied Digital Solutions, Inc.*, 2002 WL 749162 (Del.Ch. Apr. 24, 2002), although addressing a different issue, supports irrevocability. Three stockholders' representatives sued to enforce an acquirer's contractual obligation to make two post-closing earn-out payments. *Id.* at *1, 4. The acquirer moved to dismiss on the grounds that the plaintiffs had not joined all of the acquired company's stockholders, contending that they were necessary parties to the litigation. *Id.* at *9. Vice Chancellor Strine rejected this argument in light of the shareholders' representative provision in the merger:

> [The] merger agreement specifically addresses the manner in which the ... selling stockholders may, once the merger is contemplated, act to protect their collective interests. Such a provision is helpful to both the buyers and sellers in a merger, because it enables each side to resolve post-closing disputes efficiently. To accomplish such efficiency, the merger agreement empowers plaintiffs ... to act as "Stockholders' Representatives" for all the selling ... stockholders.

*Id.* at *10. He concluded that the acquirer "has no reason to fear inconsistent judgments, because a judgment against the Stockholders' Representatives will bind all of the former [acquired company's] stockholders." *Id.* at *11. The other stockholders did not face any prejudice, "because they chose to give this authority to the Stockholders' Representatives, and will share on a *pro rata* basis in any recovery obtained...." *Id.*

By contrast, the Delaware Supreme Court's decision in *Appriva Shareholder Litigation Co., LLC v. ev3, Inc.*, 937 A.2d 1275 (Del.2007), is not analogous. The *Appriva* decision involved a shareholders' representative provision that appointed two different individuals and granted them authority "together" to act "jointly" on behalf of the shareholders. *Id.* at 1291 n. 42. The provision further granted them authority to "interpret all of the terms and provisions" of the relevant agreements. *Id.* at 1289. Each shareholders' representative sued separately in the Delaware Superior Court. *Id.* at 1279. Both argued that the agreement was ambiguous as to whether they only could act jointly or had been granted authority to act individually, and each argued that they were permitted to act separately. *Id.* at 1289–91. After two different Superior Court judges held

---

**2.** *See generally* 1 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations & Business Organizations* § 7.20, at 7-49 to –51 (3d ed.1998) (discussing proxy irrevocability as a result of reliance); 2 Drexler, *supra*, § 25.09[2], at 25–20 ("[I]rrevocability of a proxy can be established by a showing of detrimental economic reliance upon its existence."); *cf.* 1 Edward P. Welch at al., *Folk on the Delaware General Corporation Law* § 212.3.5.1, at GCL–VII–60 (5th ed.2006) (noting that in construing an agreement that includes the grant of an irrevocable proxy "[t]he court ... will apply standard doctrines of contract interpretation").

that joint action was required, both shareholders' representatives appealed. The Delaware Supreme Court held that the joint representative language was ambiguous, reversed the dismissals, and remanded for further proceedings to resolve the ambiguity. *Id.* at 1292.

As in *Ballenger* and unlike in *Appriva,* the language of Section 13.2 is clear and unambiguous. By signing the Purchase Agreement, the Principal Shareholders irrevocably granted Bengoa authority to act as the Shareholders' Representative. They could not later revoke that authority. Bengoa's decisions and actions as Shareholders' Representative bind the Principal Shareholders as a matter of agency law.

### 3. The Class B Defendants

The Class B Defendants likewise are bound by Bengoa's actions in determining the Transaction Consideration. Corporate law dictates this result.

The merger of two domestic Puerto Rico corporations in 2006 was governed by Section 3051 of the General Corporation Law of 1995 of the Commonwealth of Puerto Rico (the "PRGCL"). At that time, Section 3051 paralleled Section 251 of the Delaware General Corporation Law as it existed in 1995. *Compare* 14 L.P.R.A. 14 § 3051 (2006) *with* 8 *Del C.* § 251 (1995). Like Section 251, Section 3051 required that a merger agreement state

the manner of converting the shares of each one of the constituent corporations into shares or other securities of the corporation surviving or resulting from the merger or consolidation and, if any of the shares of any of the constituent corporations are not to be converted solely into shares or other securities of the surviving or resulting corporation, the cash, property, rights or securities of any other corporation which the holders of such shares are to receive in ex-

change for, or upon conversion of such shares and the surrender of the stock certificates representing them, which cash, property, rights or securities of any other corporation they may receive in addition to the shares or other securities of the surviving or resulting corporation.

14 L.P.R.A. § 3051(b)(5); *see* 8 *Del C.* § 251(b)(5). Under Section 3051, as under Section 251, "Any of the terms of the agreement of merger or consolidation may depend upon facts ascertainable outside of such agreement; provided that the manner in which such facts shall affect the terms of the agreement, is clearly and expressly set forth in the agreement of merger or consolidation." 14 L.P.R.A. § 3051(b); *see* 8 *Del. C.* § 251(b).

This "facts ascertainable" language was added to Section 251(b) in 1974. 59 Del. Laws ch. 437, § 12 (1974). In 1996, Delaware amended Section 251(b) to add an additional sentence: "The term 'facts,' as used in the preceding sentence, includes, but is not limited to, the occurrence of any event, including a determination or action by any person or body, including the corporation." 70 Del. Laws ch. 349, § 8 (1996). In 2009, Puerto Rico updated Section 3051(b) as part of a major revision of the PRGCL to restore its alignment with the DGCL. *See* Ley Num. 164 de 16 de diciembre de 2009; P. del S.124 at 1, *available at* http://app.estado.gobierno.pr/leyes/Ley1642009.pdf (last visited Sept. 8, 2010). Section 3051(b) now contains the additional sentence added to Section 251(b) in 1996. Ley Num. 164 de 16 de diciembre de 2009 at C. 10, Art. 10.05(C)(4) ("Para propósitos de la oración anterior, el término "hechos" incluye, pero no está limitado a, la ocurrencia de cualquier evento, incluyendo una determinación o acción de una persona o cuerpo, incluida la corporación.").

If the current version of Section 3051(b) governed the merger, it would be readily apparent that the Post–Closing Adjustments were provisions made dependent "upon facts ascertainable outside of such agreement," with "facts" defined to include "the occurrence of any event, including a determination or action by any person or body...." Aveta's calculations would be a "determination ... by any person or body," so too Aveta's and Bengoa's agreement on the calculations, and likewise the outcome of any E & Y arbitration. Although the 2006 version of Section 3051(b) requires additional analysis, the result is the same.

■■■ To plumb the meaning of Section 3051(b) as it existed in 2006, I look to the history of the Delaware provision that Puerto Rico adopted.[3] Analysis begins with contemporaneous authorities addressing the purpose of the 1974 amendment. According to the official commentary, the amendment confirmed that "the terms of the merger including the exchange ratio may be made dependent upon facts ascertainable outside of the merger agreement, so long that it is made clear in the agreement ... the precise way that these facts will affect the exchange ratio or other terms of the merger."[4] Two distinguished practitioners explained the amendment similarly:

> A frequently asked question is whether the agreement of merger must state the actual or effective conversion or exchange ratio applicable to shares being converted into securities of the surviving corporation or exchangeable for securities of a third corporation or whether the statute is satisfied by an agreement of merger which states the manner of converting the shares by a formula which includes as a factor a fact which may or may not be known when the merger becomes effective, such as the market price of a stock on a specified date or the earnings or net worth of a corporation at a future date. The amendments of subsections (b) of Sections 251, 252, 255, 256 and 257 and of subsection (c) of Section 254 answer that question by adding the following sentence, which is merely declaratory or confirmatory of the existing law and practice, at the end of each of such subsections:
>
> > "Any of the terms of the agreement of merger or consolidation may be made dependent upon facts ascertainable outside of such agreement, provided that the manner in which such facts shall operate upon the terms of the agreement is clearly and expressly set forth in the agreement of merger or consolidation."

S. Samuel Arsht & Lewis S. Black, *The 1974 Amendments to the Delaware Corporation Law* 382 (1974) [hereinafter "1974 Amendments"]. This language was specifically designed to facilitate agreements that "provide for consideration contingent

---

**3.** *See TC Inv., Corp.*, 2010 WL 2593525, at *11 (looking to Delaware law "because Puerto Rico corporate law was modeled after Delaware corporate law"); *Wiley v. Stipes*, 595 F.Supp.2d 179, 185 (D.P.R.2009) (same); *see also Marquis Theatre Corp. v. Condado Mini Cinema*, 846 F.2d 86, 91 (1st Cir.1988) (turning to Delaware law for definition of the business judgment rule under Puerto Rico corporate law); *cf. Chicago Corp. v. Munds*, 172 A. 452, 454–55 (Del.Ch.1934) (giving "[s]pecial interpretive significance" to New Jersey law because "it is common knowledge that the [original DGCL] was modeled after the then existing New Jersey act").

**4.** General Corporation Law Committee of the Delaware State Bar Association, Commentary on Legislative Proposals for the 127th General Assembly, Second Session, 1974, § 12 at 18, *quoted in* 2 Welch, *supra*, § 251.10, at GCL–IX–120.

on future circumstances, such as bonus shares to be issued if certain levels of future earnings are achieved, or if market indices change between the date of agreement and the date of effectuation."[5]

Nine years later, in 1983, parallel "facts ascertainable" language was added to Section 151(a), which addresses the voting powers, designations, preferences, rights and qualifications, limitations or restrictions of a class or series of stock, including dividend and conversion rates. 8 *Del. C.* § 151(a). The amendment confirmed that these attributes

> may be made dependent upon facts ascertainable outside of the certificate of incorporation or board resolutions providing for the issuance of such class or series of stock, so long as it is made clear in the certificate or board resolution the precise way that these facts will operate on the class or series of stock so issued.[6]

Commentators noted that the provision tracked the 1974 amendment to Section 251 and observed that "these incorporation by reference provisions are not limited to references to the corporate books or public records." 1983 Amendments, *supra,* at 313.

The Delaware courts subsequently interpreted the language of Section 151(a) as encompassing not only "facts ascertainable" from verifiable and objective data generally accessible to stockholders, but also mixed factual and legal determinations. In *In re Bicoastal Corp.,* 600 A.2d 343 (Del.1991), Mesa Holdings Limited Partnership held junior cumulative redeemable preferred stock of Bicoastal Corporation that gave Mesa the right to elect a board majority if the preferred was not redeemed by a specific date. *Id.* at 346. Although the preferred stock generally could be redeemed by Bicoastal "at any time," Bicoastal could not redeem if the redemption would violate any covenant contained in "any contract, agreement, obligation, or guarantee [of the Corporation.]" *Id.* (internal quotations omitted). Bicoastal attempted to redeem the stock, but Mesa rejected the redemption as violating the redemption restriction. Once the mandatory redemption date passed, Mesa exercised its election right. Bicoastal asserted that Mesa improperly rejected the redemption because the redemption restriction was invalid. Bicoastal contended that the restriction did not depend "upon a *'fact* ascertainable outside the certificate of incorporation' but rather ... upon a legal conclusion." *Id.* at 349. Bicoastal also argued that the "manner in which such facts shall operate" was not "clearly and expressly set forth" because the provision vaguely referred to "any contract, agreement, obligation, or guarantee" of Bicoastal. *Id.* (internal quotations omitted). The Delaware Supreme Court rejected both arguments;

---

**5.** 2 Drexler, *supra,* § 35.04[1], at 35–11; *see* 1 Balotti, *supra,* § 9.9, at 9–14 ("It is most frequently used to permit the final terms for the stock or cash consideration to be determined as a result of values established by the stock markets within days of the effective date of the merger, which could be weeks of months after an exchange ratio is initially negotiated."); Lewis S. Black, Jr. & A. Gilchrist Sparks, III, *Analysis of the 1983 Amendments to the Delaware General Corporation Law* 313 (1983) [hereinafter "1983 Amendments"] (referring back to 1974 amendments and describing them as intended "to accommodate the statute to the common practice in mergers of tying the conversion or exchange of shares to market prices on a given date or over a specified period of time").

**6.** H. 185, 132d Gen. Assembly 56, 64 Del. Laws, ch. 112, § 8 (1983), *quoted in* 1 Welch, *supra,* § 151.9 at GCL–V–47; *accord* 1983 Amendments at 313–14.

We find that Bicoastal was in a position to make the factual determination that a redemption would violate a covenant of Bicoastal by simply referring to the terms of the junior note or the terms of any other contract at issue. Bicoastal's other creditors and shareholders were similarly in a position to refer to the terms of such contracts since they were public documents available from the Securities Exchange Commission or available pursuant to the stockholders' statutory right to inspect corporate records. 8 *Del. C.* § 220.

. . .

We find that certificates of incorporation commonly contain provisions which make broad and general reference to other "contracts, agreements, guarantees, or obligations" of the corporation. . . . The nonredemption provision clearly puts all relevant constituents on notice that Bicoastal is prohibited from redeeming the junior preferred stock if such redemption would violate any contract of Bicoastal.

*Id.* at 349–50. The Delaware Supreme Court therefore concluded that "the preference arising from the nonredemption provision is consistent with the statutory requirements of 8 *Del. C.* § 151(a)." *Id.* at 350.

Similarly in *HB Korenvaes Investments, L.P. v. Marriott Corporation,* 1993 WL 205040 (Del.Ch. June 9, 1993), Chancellor Allen considered a challenge by preferred stockholders to a corporate restructuring involving the spin-off of a newly created subsidiary by way of a special dividend to stockholders. Holders of the preferred sought to enjoin the transaction as, among other things, a breach of fiduciary duty. Chancellor Allen dismissed the fiduciary duty claim, finding that "the tailored terms of the certificate, which define the nature of the property [*i.e.,* the security] owned, govern the propriety of the proposed transaction." *Id.* at *6. The governing terms provided for the conversion price of the preferred stock to adjust in the following manner upon the payment of any dividend:

> In case the Corporation shall, by dividend or otherwise, distribute to all holders of its Common Stock . . . assets (including securities . . .), the Conversion Price shall be adjusted so that the same shall equal the price determined by multiplying the Conversion Price in effect immediately prior to the [record date for the dividend] by a fraction of which the numerator shall be the current market price per share . . . *less the then fair market value (as determined by the Board of Directors, whose determination shall be conclusive and shall be described in a statement filed with the transfer agent for the Convertible Preferred Stock) of the portion of the evidences of indebtedness or assets so distributed applicable to one share of Common Stock* and the denominator shall be such current market price per share. . . .

*Id.* at *7 (emphasis added). This provision relied on two facts ascertainable outside of the certificate: (i) the "current market price per share" and (ii) a determination of fair market value by the Board of Directors. Chancellor Allen dismissed the preferred stockholders' fiduciary duty claims because their rights were controlled by this clear and unambiguous provision. *Id.*

In a later decision in the same case, Chancellor Allen refused to enjoin the dividend due to an alleged violation of the conversion provision. *HB Korenvaes Invs., L.P. v. Marriott Corp.,* 1993 WL 257422 (Del.Ch. July 1, 1993). The preferred stockholders challenged how the board was calculating the "then fair mar-

ket value" of the dividend. Finding that the board of directors had adopted one of at least two possible methods for determining "then fair market value," Chancellor Allen rejected the preferred stockholders' contention:

> The certificate of course confers broad discretion on [the board] in implementing the formula of Section 5(e)(iv) and makes its choices "conclusive." While that grant may too imply a duty of commercial good faith, the facts adduced do not suggest that the employment of the formula by defendants has been other than in good faith.

*Id.* at \*18. Chancellor Allen similarly rejected a related dispute over the point in time intended by the phrase "then": "[T]he 'then fair market' is to be decided 'by the Board of Directors, whose determination shall be conclusive,' so long as made in good faith I would add." *Id.* at \*18 n. 19. Implicit in these determinations, both at the motion to dismiss stage and on the application for preliminary injunction, was the validity of the conversion provision as depending on facts ascertainable outside of the certificate of incorporation.

Despite the seeming clarity of *Bicoastal* and *HB Korenvaes,* Section 151(g) was amended again in 1994 to specify that "[t]he term 'facts,' as used in this subsection, includes, but is not limited to, the occurrence of any event, including a determination or action by any person or body, including the corporation." 69 Del. Laws, ch. 264, § 1 (1994). The legislative synopsis explained that

> [t]he amendment to Section 151(a) is intended to make it clear that a 'fact' can include an event or determination, including an event or determination within the control of the corporation or a person or body affiliated with the corporation, such as a decision by its board of directors or one of its officers or agents.

S. 325, 137th Gen. Assembly 1, 69 Del. Laws, ch. 264, § 1 (1994), *quoted in* 1 Welch, *supra,* § 151.9 at GCL–V–50. Commentators contemporaneously explained the purpose of the new language at greater length:

> Since [the 1983] amendment, practitioners have questioned the scope of the term "facts," focusing in particular on whether the term includes events or decisions that may be within the control of the corporation or its board of directors or officers.... This amendment resolves the issue in favor of a reading of the statute to permit incorporating in the terms of a class or series of stock facts which depend upon events or determinations within the control of the corporation or a person or entity affiliated with the corporation, including decisions by its board of directors, its officers or its agents. This resolution of the issue accommodates the growing use of classes or series of stock whose terms are closely tied to unpredictable or fast-changing market conditions or which compete with other instruments in the financial markets. While, in proposing this resolution, the Corporation Law Section of the Delaware Bar Association was not unmindful of the possibility that certain self-made facts could be subject to manipulation, it was thought that any potential for abuse should be held in check by market forces, as well as the equitable powers of the courts.

Lewis S. Black, Jr. & Frederick H. Alexander, *Analysis of the 1994 Amendments to the Delaware General Corporation Law* 313 (1994). As a result of this amendment, "the issues of whether subjective judgments can be utilized in the ascertainment of facts pursuant to Subsection 151(a) and whether unilateral authority can be given to the issuer with respect to such judg-

ments appear[ed] to have been laid to rest." [7]

Section 251(b) was not amended in 1994 to append a parallel sentence. That same year, the Court of Chancery interpreted the "facts ascertainable" language of Section 251(b) in seeming tension with how *Bicoastal* and *HB Korenvaes* analyzed Section 151(a). *See Jackson v. Turnbull,* 1994 WL 174668 (Del.Ch. Feb. 8, 1994), *aff'd,* 653 A.2d 306 (Del.1994) (TABLE). The plaintiffs in *Jackson* challenged the validity of a merger agreement which provided that the minority's shares were "converted into ... the right to receive $1,501.19 per share in cash (or if the final appraisal of Ambient Capital Group, Inc. is a higher amount per share, then such higher amount as determined by such appraisal)." *Id.* at *1. The *Jackson* decision held that this formulation impermissibly delegated the directors' statutory responsibility to determine the merger consideration to a financial advisor, thereby rendering the merger void. *Id.* at *5. In a footnote, the Court mentioned the "facts ascertainable" concept: "Plaintiffs acknowledge the statutory exception where the price is 'dependent upon facts ascertainable outside of [the merger] agreement,' 8 *Del. C.* § 251(b), but are not seriously opposed in their argument that the exception is inapplicable here." *Id.* at *3 n. 5 (alteration in original).

Lacking insight into why Section 251(b) did not apply, the guardians of the DGCL presumed it was the absence of a sentence similar to the recent addition to Section 151(a). *See* 2 Drexler, *supra,* § 35.04[1], at 35–11 (citing *Jackson* as having "raised inferentially the specter that the absence of similar language in the Statute's merger

sections might produce a different result"). To fix any inadvertent implication, Section 251(b) was amended in 1996 to add a parallel sentence. 70 Del. Laws ch. 349, § 8 (1996). According to the legislative synopsis, the change was designed "to conform [the merger provisions] with the 1994 amendment to Section 151(a)." S. 363, 138th Gen. Assembly 7, 70 Del. Laws ch. 349, § 8 (1996), *quoted in* 2 Welch, *supra,* § 251.10 at GCL–IX–126. Influential commentators agreed:

The merger provisions of the General Corporation Law were amended in 1974 and subsequently to make it clear that the terms of a merger agreement, including the exchange ratio applicable to shares of the constituent corporations, could be made dependent on facts ascertainable outside of the merger agreement so long as the merger agreement "clearly and expressly" sets forth the manner in which those facts are to operate on the exchange ratio or other merger terms. A similar amendment was made in 1983 to Section 151(a).... The amendment to Section 151 proved troublesome, as practitioners questioned the scope of the term "facts", with some practitioners arguing that determinations and other actions involving discretion were "judgments", rather than the type of "facts" contemplated by the statute. In order to clarify this ambiguity, Section 151 was amended in 1994 to provide that the term "facts" could include any event, including a determination or action. While this amendment had salutary effects with respect to Section 151, it aggravated a similar ambiguity with respect to Section 251, since

---

**7.** 1 Drexler, *supra,* § 17.01[1], at 17–3 to 17–4; *accord* 1 Balotti, *supra,* § 5.7 ("Prior to 1994, there was some question as to the extent to which extrinsic 'facts' could be within the control of the corporation. In 1994, Section 151(a) was amended to make clear ..., as the commentary to the amendment suggests, [that] a 'fact' for purposes of Section 151(a), can consist of a decision by a corporation's board, officers or agents.").

questions sometimes arise as to whether merger terms are sufficiently "fact-like". *See Jackson v. Turnbull*, Del. Ch., C.A. No. 13042, Berger, V.C. [1994 WL 174668] (February 8, 1994), *aff'd*, 653 A.2d 306 (Del.1994).

The 1996 amendments resolve this ambiguity with respect to mergers and conform the merger statutes to Section 151(a). It is important to note that the amendments are not intended in any way to alter the fiduciary duties of directors approving a merger agreement or making determinations, or taking any other action that constitutes a fact within the merger agreement.

Lewis S. Black, Jr. & Frederick H. Alexander, *Analysis of the 1996 Amendments to the Delaware General Corporation Law* 314–15 (1996) [hereinafter, "1996 Amendments"]. As a result of the 1996 amendment, "[a] potential problematic area has presumably been laid to rest." 2 Drexler, *supra*, § 35.04[1], at 35–11.

Since the 1996 amendments, the Court of Chancery addressed the "facts ascertainable" language in *Nagy v. Bistricer*, 770 A.2d 43 (Del.Ch.2000). The two directors and controlling stockholders of Riblet Products Corporation caused Riblet to enter into a merger agreement with Coleman Cable Acquisition, Inc., another company they controlled. The agreement provided that each share of Riblet stock would be converted into 22.29 shares of Coleman, but further required that Coleman's board

> retain an independent investment bank to provide the Board of Directors of [Coleman] within 60 days after [signing]

with a valuation of Riblet and advise as to its opinion on the fairness of the Merger Consideration, after which the Board of Directors of [Coleman] may adjust the ... Merger Consideration in light of such valuation and advise [sic].

*Id.* at 48. The lone minority stockholder filed suit, asserting (among other theories) that the Riblet directors breached their fiduciary duties by ceding the power to determine the merger consideration to the acquirer, a corporation whose interests necessarily were adverse to Riblet. Vice Chancellor Strine agreed and granted summary judgment in favor of the plaintiff on his claim that the defendant directors "breached their fiduciary duties in connection with the Merger Agreement." *Id.* at 64. He found that the defendant directors "essentially abdicated their duty to determine a fair merger price to the [acquirer]," which was "inconsistent with [their] non-delegable duty to approve the Merger only if the Merger was in the best interests of Riblet and its stockholders." *Id.* at 62. The statutory authority to make the terms of merger dependent "upon facts ascertainable outside of such agreement" did not aid the defendants in defending against the fiduciary duty claim, precisely as the General Assembly intended. *Id.* at 61–62.[8]

As these references demonstrate, the operative language from the 1974 version of Section 251(b) that appears in the 2006 version of Section 3051(b) authorized (at a minimum) a merger agreement to make the consideration into which shares were converted "contingent on future circum-

---

**8.** *See* S. 363, 138th Gen. Assembly 7, 70 Del. Laws ch. 349, § 8 (1996) ("These amendments are not intended to alter the fiduciary duties of a board of directors in authorizing a merger agreement with terms that turn on determinations or actions made by any person or body, or in making any determinations or taking any action constituting a fact under

these sections."), *quoted in* 2 Welch, *supra*, § 251.10, at GCL–IX–126; 1996 Amendments, *supra*, at 315 ("[T]he amendments are not intended in any way to alter the fiduciary duties of directors approving a merger agreement or making determinations, or taking any other action that constitutes a fact within the merger agreement.").

stances." 2 Drexler, *supra*, § 35.04[1], at 35–11. This authority included calculations based on "certain levels of future earnings," *id.*, or the "net worth of a corporation at a future date," 1974 Amendments, *supra*, at 382. It contemplated determinations based on "the corporate books or public records." 1983 Amendments, *supra*, at 314. As shown by the decisions interpreting comparable language in Section 151(b), the original language extended to determinations by the corporation or its board of directors. *See Bicoastal*, 600 A.2d at 349 ("Bicoastal was in a position to make the factual determination that a redemption would violate a covenant of Bicoastal by simply referring to the terms of the junior note or the terms of any other contract at issue."); *HB Korenvaes*, 1993 WL 257422, at *18 (enforcing conversion provision in preferred stock where fair value determination was made by issuer's board of directors); *HB Korenvaes*, 1993 WL 205040, at *6 (same).

The Post–Closing Adjustments easily qualify as provisions dependent on "facts ascertainable outside of the merger agreement" within the authority provided by the 2006 version of Section 3051(b). The Post–Closing Adjustments turn on financial figures from PMC's books and records, including its audited financial statements. The methods for deriving those amounts are "clearly and expressly set forth in the agreement of merger or consolidation." 14 L.P.R.A. § 3051(b). Consistent with *Bicoastal* and *HB Korenvaes*, the calculations are made initially by Aveta and then jointly by Aveta and Bengoa. If there is a dispute, the calculations are made by E & Y. The entire procedure is "clearly and expressly set forth."

No one has suggested that the procedures are impermissibly vague, constitute an improper abdication, or otherwise give rise to a breach of fiduciary duty. Nor would such a suggestion have merit. The Purchase Agreement did not broadly cede the determination of the Transaction Consideration to the acquirer (as in *Nagy* ), nor did it set a dubious floor price and delegate to a financial advisor unfettered discretion to depart upwards (as in *Jackson* ). The Purchase Agreement establishes formulas and procedures for the Post–Closing Adjustments. Those provisions must be followed. Moreover, by requiring that the Post–Closing Adjustments be determined by a neutral arbitrator unless parties with adverse interests (Aveta and Bengoa) agree, the Purchase Agreement places a natural check on the exercise of discretion.

Because Section 3051(b) authorized the Purchase Agreement to provide in this fashion for the determination of the Post–Closing Adjustments, it does not matter whether Section 13.2 of the Purchase Agreement gave Bengoa authority to act on behalf of some, all, or none of PMC's stockholders. All that Section 3051(b) required was for Bengoa to be designated as the individual who would follow the procedures and make or participate in the determinations called for by the Purchase Agreement. Because those provisions draw their power from Section 3051(b) as a matter of corporate law, no grant of agency authority was needed.

For the same reasons, all of the Class B Defendants are bound by the resulting determinations, including the outcome of the E & Y arbitration. All of the Class B shareholders held shares that were converted by merger into a right to receive the Transaction Consideration as determined in accordance with the Purchase Agreement. The resulting calculations determine what those holders receive. Irrespective of agency issues, the outcome binds all holders of Class B shares.

### 4. The Total Proposal

■ If the Total Proposal superseded or modified the Purchase Agreement, then it could affect whether or to what degree the Post–Closing Adjustments bind the former PMC shareholders. I addressed Bengoa's ability to rely on the Total Proposal in the Contempt Decision, holding that it was an unenforceable agreement to agree. 986 A.2d at 1185. That ruling binds the Principal Shareholder Defendants under the doctrine of *res judicata*. It controls as to the Class B Defendants under the doctrine of *stare decisis*.

In the Contempt Decision, I explained that as to Bengoa, *res judicata* foreclosed his ability to argue that the Total Proposal novated or in any way altered the Purchase Agreement:

> Bengoa could have raised arguments based on the Total Proposal [in the Arbitration Action]. He signed it in December 2006, two years before the [Arbitration Decision] issued. While Bengoa was litigating this matter, the plaintiffs in the Lugo Delaware Action and the Lugo Puerto Rico Action were making their own novation argument. Yet Bengoa never mentioned the Total Proposal, and his current counsel could not explain why.
>
> ... Because the Total Proposal does not contain an arbitration provision, if Vice Chancellor Lamb had credited Bengoa's current position, it would have had case-dispositive implications. The existence and effect of the Total Proposal was an affirmative defense or compulsory counterclaim that Bengoa could and should have asserted before Vice Chancellor Lamb.
>
> Res judicata also forecloses the more subtle argument that the Total Proposal amended the terms of the arbitration provisions that Vice Chancellor Lamb enforced. The validity and scope of an arbitration provision is for this Court to decide, absent a clear delegation to the arbitrator of the power to determine the scope of the arbitral proceeding. The [Arbitration Decision] necessarily determined whether and to what degree Bengoa must arbitrate.... If Bengoa had raised the Total Proposal and been successful on his amendment theory, then the [Arbitration Decision] would have been different. In lieu of an order compelling Bengoa to arbitrate under Sections 2.2., 2.3, and 2.4, Vice Chancellor Lamb could have ordered Bengoa and Aveta to arbitrate under those sections as modified by the Total Proposal.

*Id.* (citations omitted). Because Bengoa could have raised the novation or alteration arguments as affirmative defenses in the Arbitration Action, the Arbitration Decision barred him from raising them subsequently. *Id.*

■ *Res judicata* also precludes the Principal Shareholder Defendants from re-litigating the validity of the Total Proposal. *Res judicata* bars a party from litigating the same cause of action after a judgment has been entered in a prior suit involving the same parties *or their privies.* The doctrine has five elements:

> (1) the court making the prior adjudication had jurisdiction, (2) the parties in the present action are either the same parties or in privity with the parties from the prior adjudication, (3) the cause of action must be the same in both cases or the issues decided in the prior action must be the same as those raised in the present case, (4) the issues in the prior action must be decided adversely to the [defendants'] contentions in the instant case, and (5) the prior adjudication must be final.

*Bailey v. City of Wilmington,* 766 A.2d 477, 481 (Del.2001).

For the Principal Shareholder Defendants, all of the elements of *res judicata* are facially met. Vice Chancellor Lamb had jurisdiction over the validity of the Total Proposal when rendering the Arbitration Decision and ordering Bengoa to arbitrate. The Principal Shareholder Defendants signed the Purchase Agreement and are in privity with Bengoa. The validity of the Total Proposal is the identical issue in both cases. Vice Chancellor Lamb's final order in the Arbitration Action resolved the Total Proposal issue adversely to the Principal Shareholder Defendants because he enforced the Purchase Agreement as written, not the Total Proposal or some hybrid of the two.

■■■■■■ There are strong arguments that *res judicata* also applies to the Class B Defendants. The only contestable issue is privity, where *res judicata* does not require a direct contractual relationship. Privity is instead "a legal determination for the trial court with regard to whether the relationship between the parties is sufficiently close to support preclusion." *Higgins v. Walls*, 901 A.2d 122, 138 (Del.Super.2005). Parties are in privity for *res judicata* when their interests are identical or closely aligned such that they were actively and adequately represented in the first suit.[9] Nevertheless, prudence dictates caution when applying this flexible test:

Haphazard use of the term "privity" can lead to improper findings of preclusion. This is so because the term, except in reference to specific legal relationships, "is so amorphous that it often operates as a conclusion rather than an explanation." In the preclusion analysis, even a legal relationship such as husband and wife "does not [alone] justify imposing preclusion on one of them on the basis of a judgment affecting the other." Rather, "preclusion can properly be imposed when the claimant's *conduct* induces the opposing party reasonably to suppose that the litigation will firmly stabilize the latter's legal obligations."

*Kohls v. Kenetech Corp.*, 791 A.2d 763, 769 (Del.Ch.2000) (quoting Restatement (Second) of Judgments § 62, cmt. c (1982)) (footnotes omitted), *aff'd*, 794 A.2d 1160 (Del.2002).

■■■■ I need not ponder privity because the Class B Defendants' attempt to relitigate the Total Proposal falls short under any circumstances. With the Class B Defendants having failed to cite any reason why the Contempt Decision was erroneous, "[n]ormal respect for the principle of *stare decisis*" requires that the same result apply. *Kohls*, 791 A.2d at 770.

The Class B Defendants have not suggested how their claims "are distinguishable from those adjudicated [in the Contempt Decision]." *Id.* They have not

---

**9.** *See Orloff v. Shulman*, 2005 WL 3272355, at *9 (Del.Ch. Nov. 23, 2005) (holding that defendant in second suit was in privity for *res judicata* purposes because his interests were aligned with those of defendant in first suit, which concerned same facts); *see also Wilm. Hous. Auth. v. Nos. 500, 502 & 504 King St.*, 273 A.2d 280, 281–82 (Del.Super.Ct.1970) (finding parties in privity because they had identical interests actively represented in first suit). Courts outside of Delaware have enforced judgments against non-parties with far less of a connection than exists here. *See, e.g., In re Medomak Canning*, 922 F.2d 895,

901 (1st Cir.1990) ("[P]rivity may be established by identification of interests, even where representation of those interests is not authorized."); *Amalgamated Sugar Co. LLC v. NL Indus., Inc.*, 825 F.2d 634, 641 (2nd Cir. 1987) (corporation's prior litigation bars individual shareholder from relitigating the claims); *In re Garcia*, 340 B.R. 680, 688 (Bankr.D.P.R.2006) (applying *res judicata* to bar claims where "real parties in interest" in prior action included party's "related corporations and subsidiaries" and were therefore "the same for *res judicata* purposes").

identified any new or different evidence, pointed to any mistake of law or fact, cited intervening authority, or suggested any other compelling reason why I would decide the Total Proposal issue differently if I considered it anew. Their counsel candidly conceded during the June 30, 2010, hearing on the cross-motions for summary judgment that he lacked any new, additional, or alternative evidence beyond what I previously considered. *See* Hr'g Mot. for S.J. Tr. 18:21 to 19:1. For its part, Aveta has offered additional reasons why the Total Proposal was not a binding agreement. Under the doctrine of *stare decisis,* I adhere to my conclusion that the Total Proposal was not a novation, not an amendment, and not an agreement. It was a non-binding agreement to agree. Contempt Decision, 986 A.2d at 1186–87.

Despite their inability to suggest why a different result might obtain, the Shareholder Defendants alternatively ask that they be permitted to litigate the validity of the Total Proposal before E & Y in the arbitration. For reasons next discussed, the Shareholder Defendants have no right to participate in the arbitration and will not be permitted to do so. And lest there be any doubt, the Total Proposal issue will not be litigated in the arbitration. Vice Chancellor Lamb ordered Bengoa to arbitrate in accordance with the Purchase Agreement, not in accordance with the Purchase Agreement as potentially modified by the Total Proposal should E & Y see fit to deem it so. The Arbitration Decision long ago became a final judgment. The Total Proposal is not part of the arbitration.

**B. The Shareholder Defendants May Not Participate In The Arbitration.**

 The Shareholder Defendants argue that if they are bound by the outcome of the E & Y arbitration, they should be permitted to intervene and participate in that proceeding. They cite no authority other than an amorphous appeal to equity and general notions of fairness. I find nothing unfair about the Post–Closing Adjustments or their operation in accordance with Section 3051(b) of the PRGCL.

Allowing the Shareholder Defendants to participate in the arbitration would rewrite the Purchase Agreement to craft a different set of procedures for determining how certain "facts ascertainable outside of such agreement . . . shall affect the terms of the agreement." 14 L.P.R.A. § 3051(b). Ironically, at that point the provisions no longer would "clearly and expressly set forth in the agreement of merger or consolidation." *Id.*

The relief the Shareholder Defendants request also would be unworkable and unfair to Aveta. In the Purchase Agreement, Aveta bargained for and obtained a procedure for determining the Transaction Consideration and resolving other Post–Closing Adjustments that allowed them to work with and, if necessary, arbitrate against Bengoa. The Purchase Agreement contemplated an efficient and streamlined process, not an unwieldy arbitration with potentially more than 100 participants. Tellingly, the Shareholder Defendants' counsel could not explain during argument how the opened-up arbitration process would function. *See* Hr'g Mot. for S.J. Tr. 13:24 to 16:13. As a matter of corporate law, the Shareholder Defendants have no right to intervene in the arbitration and alter the procedures that were "clearly and expressly set forth in the agreement of merger or consolidation." 14 L.P.R.A. § 3051(b).

**C. The Shareholder Defendants Breached The Forum Selection Provision.**

Aveta lastly seeks a determination that by filing suit in Puerto Rico, the Share-

holder Defendants breached the exclusive forum selection provision in the Purchase Agreement. The Principal Shareholder Defendants signed the Purchase Agreement and are bound directly by its choice of forum. The Class B Defendants bound themselves by their conduct.

A non-signatory to a contract will be estopped from arguing that a dispute-resolution provision does not apply when the non-signatory "consistently maintain[s] that other provisions of the same contract should be enforced to benefit him." *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 200 (3d Cir. 2001), *cited in NAMA Holdings, LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 430–31 (Del.Ch.2007). "Equity will not allow a party to sue to enforce the provisions of a contract that it likes, while simultaneously disclaiming the provisions that it does not." *Town of Smyrna v. Kent County Levy Court*, 2004 WL 2671745, at *4 (Del.Ch. Nov. 9, 2004) (enforcing dispute-resolution provision against non-signatory).

In the Puerto Rico actions, the Shareholder Defendants have alleged that the Total Proposal—a meaningless document unless Bengoa signed it as the Shareholders' Representative—superseded the Purchase Agreement. They have sought specific performance of the Total Proposal and to recover damages under it. As discussed above, the Total Proposal is not a free-standing document, and its provisions facially reference and depend for their meaning on formulas and procedures in the Purchase Agreement. The Shareholder Defendants' claims in Puerto Rico therefore depend on the Purchase Agreement.

Non-signatories like the Class B Defendants cannot have it both ways. By suing in Puerto Rico to recover the Earn–Out Payments called for by the Purchase Agreement as allegedly altered by the Total Proposal, the Class B Defendants invoked the terms of the Purchase Agreement. Having done so, they are estopped from picking only the provisions they like and ignoring the others. Because their claims arise out of and relate to the Purchase Agreement, they are bound by the contractual forum selection provision, and they were obligated to bring their claims in a Delaware court.

By pursuing litigation in Puerto Rico for their own tactical reasons, the Shareholder Defendants breached the Purchase Agreement. Aveta has been harmed by being forced to engage in duplicative and unnecessary litigation in Puerto Rico, contrary to the bargain it struck in the Purchase Agreement. The Shareholder Defendants are jointly and severally liable for the expenses Aveta has incurred in the Puerto Rico actions as a result of the Shareholder Defendants' breach. *See* 6 *Del. C.* § 2701 ("An obligation or written contract of several persons shall be joint and several, unless otherwise expressed."). The parties shall confer regarding the measure of Aveta's damages and determine what additional proceedings are necessary to quantify them. I already have held that Bengoa also must compensate Aveta for these amounts as a result of his contumacious conduct. Contempt Decision, 986 A.2d at 1188–89. As Aveta recognizes, it cannot obtain a double recovery, and therefore any recovery from Bengoa should be taken into account.

Aveta also is entitled to its expenses (including attorneys' fees) incurred in pursuing this action. The Purchase Agreement states:

13.5. *Attorneys' Fees*. If any Action or Proceeding for the enforcement of this Agreement is brought with respect to or because of an alleged dispute, breach,

default or misrepresentation in connection with any of the provisions hereof, the successful or prevailing party shall be entitled to recover reasonable attorneys' fees, expenses and other costs incurred in that Action or Proceeding, in addition to any other relief to which it may be entitled.

PA § 13.5. "Where a contract places the responsibility for payment of attorneys' fees on any party who either breaches the contract or fails to perform in accordance with the terms of the contract, courts will enforce the bargained-for provision absent evidence of an ambiguity or contrary intent." *L & W Ins., Inc. v. Harrington*, 2007 WL 1756540, at *3 (Del.Ch. June 6, 2007) (internal citations omitted). "The prevailing party's contractual right to the payment of money ... cannot be forgiven in whole or in part by a court out of compassion for the non-prevailing party." *Id.*

### III. CONCLUSION

For the foregoing reasons, plaintiffs' motion for summary judgment is granted, and the defendants' motion for summary judgment is denied. The Shareholder Defendants are bound by the result of the Post–Closing Adjustments, including the outcome of the arbitration before E & Y. The Shareholder Defendants may not participate in that proceeding. The Shareholder Defendants are barred from relitigating the effect of the Total Proposal under the doctrine of *res judicata* and as a matter of *stare decisis*. The Shareholder Defendants are jointly and severally liable for the damages caused by their breach of the exclusive forum selection provision in the Purchase Agreement. Aveta is separately entitled to its expenses in this proceeding under Section 13.5 of the Purchase Agreement. IT IS SO ORDERED.