In re OXFORD HEALTH PLANS, INC., Securities Litigation.

In re Oxford Health Plans, Inc., Derivative Litigation, This Document Relates To All Federal Derivative Actions Consolidated Under MDL–1222–D (CLB).

MDL No. 1222–D CLB.

United States District Court, S.D. New York.

March 9, 2000.

Gandolfo V. DiBlasi, Robert J. Giuffra, Jr., Sullivan & Cromwell, New York City.

## MEMORANDUM & ORDER

BRIEANT, District Judge.

By motion filed on March 18, 1999 and heard on June 23, 1999, nominal defendant Oxford Health Plans, Inc. ("Oxford") and individual defendants Stephen F. Wiggins, James B. Adamson, Marcia J. Radosevich, Robert B. Milligan, Fred F. Nazem, Benjamin Safirstein and Thomas A. Scully (the "Director Defendants" referred to hereinafter together with defendant Oxford as the "Oxford Defendants") move pursuant to Rules 23.1, 12(b)(6) and 9(b), Fed.R.Civ.P., to dismiss the Second Amended Derivative Complaint (the "Complaint") on the grounds that (1) Plaintiffs failed to make a pre-suit demand on Oxford's Board of Directors (the "Board") or properly to allege demand futility; (2) Plaintiffs fail to state a claim for intentional or reckless breach of fiduciary duty, for gross mismanagement, for waste of corporate assets, and for breach of the duty of loyalty by insider trading; and (3) Plaintiffs do not fairly and adequately represent the interests of Oxford because their membership in the plaintiff class in the direct action against Oxford creates a conflict of interest. Plaintiffs filed opposition papers on May 3, 1999 and the Oxford Defendants filed reply papers on May 28, 1999.

The Oxford Derivative Litigation consisted originally of seven consolidated cases brought by plaintiffs (1) Edna Roth, (2) Arthur Plevy, (3) Judith Mosson (with two separate cases), (4) Clark Boyd, Jane Boyd & Dane Field, (5) Angeles Glick, and (6) Cheryl Fisher & William Steiner. However, the Second Amended Derivative Complaint, consisting of 113 pages, filed January 29, 1999, names only three plaintiffs, Dane Field, John

Fritschle and Todd Bishop. *See* Complaint, ¶¶ 14–16. Only Dane Field was originally a plaintiff in these consolidated actions; the other two were joined in the Second Amended Derivative Complaint without comment or explanation as far as this Court is aware. These three plaintiffs allege that they are and were Oxford shareholders "at the time of the transactions and events" at issue but they have not verified the Complaint as required by Rule 23.1. The court assumes the failure to verify is merely a scrivener's error which will be remedied, having no effect on the motion.

These actions are based on the same allegations which support the companion litigation *Oxford Securities Litigation, MDL Docket No. 1222.* The reader's familiarity with the prior decision of this Court in that litigation is assumed. *See In re Oxford Health Plans, Inc. Securities Litigation,* 182 F.R.D. 42 (S.D.N.Y.1998), and *In re Oxford Health Plans, Inc. Securities Litigation,* 191 F.R.D. 369 (S.D.N.Y.2000)(order certifying class action).

The Defendants are two internal and five outside directors of Oxford, three of whom served on the Audit Committee at relevant times. Defendant Wiggins founded Oxford in 1984 and served as Chief Executive Officer ("CEO") and Chairman of the Board until August 1997. Mr. Wiggins resigned as CEO in August 1997 and ceased to be Chairman of the Board in February 1998, but remains a member of the Board. He is considered an internal Director.

Defendant Adamson was an independent, outside Director on Oxford's Board from January 1996 until September 1998. He is the Chairman, CEO and president of Advantica Restaurant Group, Inc., one of the largest restaurant companies in the United States, with annual revenue of approximately $2.7 billion.

Defendant Milligan has been an independent, outside Director on Oxford's Board since July 1992. He joined the Audit Committee in May 1998. He is currently President and CEO of Fairchester, Inc., a business and financial consulting firm. Until December 1997, he was Director, President and CEO of Verigen, Inc., a biopharmaceutical company.

Defendant Nazem has been a member of Oxford's Board since June 1990 and became Chairman of the Board in February 1998. He also serves as chairman of the Audit Committee. He is the founder and Managing General Partner of Nazem and Company, a venture capital money management firm.

Defendant Radosevich has been an independent, outside Director on Oxford's Board since July 1994. She is currently a consultant to Boston University's Health Policy Institute and was formerly the President and CEO of HPR, Inc., a software company that she co-founded in 1998.

Defendant Dr. Safirstein served as Senior Medical Director for Oxford from 1985 until September 1992 and later served as Oxford's New York Regional Vice President and Medical Director. He has served as a member of Oxford's Board since 1985. Dr. Safirstein is Board certified in internal and pulmonary medicine and practices with the Montclair Medical Group in Montclair, New Jersey. He is also a clinical Associate Professor of Medicine and Director of Pulmonary Medicine at Saint Michael's Medical Center.

Defendant Scully has been an independent, outside Director on Oxford's Board since September 1993 and serves as a member of the Audit Committee. He is the President of the Federation of American Health Systems, a health policy advocacy group established in 1966 that represents some 1,700 owned and managed hospitals, health-care systems or allied companies involved in health insurance or health-care systems. Mr. Scully was a member of the White House staff from 1989 through 1992, serving as Deputy Assistant for Domestic Policy to President Bush, counselor to Director of OMB and the Associate Director of OMB for Human Resources, Veterans and Labor.

The principal issue presented in this motion is whether the action must be dismissed for failure to allege facts which show futility of a prior demand on the Board to bring this action itself. Oxford is incorporated in Delaware and the parties agree that the Court must apply Delaware law to Plaintiffs' claims. *See, e.g., Kamen v. Kemper Financial Services, Inc.,* 500 U.S. 90, 108–09, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991) ("[The Court]

must apply the demand futility exception as it is defined by the law of the State of incorporation."). In the Complaint, Plaintiffs concede that no demand was made upon Oxford's Board of Directors prior to the commencement of this lawsuit. Therefore, under Delaware law, Plaintiffs must demonstrate that such a demand would have been futile. *See* Fed.R.Civ.P. 23.1; *Rales v. Blasband,* 634 A.2d 927, 932 (Del.1993); *Aronson v. Lewis,* 473 A.2d 805, 811–812 (Del.1984).[1] This rule is a matter of substantive law, which expresses the public policy of Delaware, and not a mere matter of procedure. Rule 23.1 of the Federal Rules of Civil Procedure also requires similar allegations.

Plaintiffs bring this lawsuit derivatively on behalf of nominal defendant Oxford, alleging that the Oxford Officers and Directors' conduct as set forth in the *Oxford Securities Litigation* amounted to a breach of the duty of care and loyalty, gross mismanagement and corporate waste. Plaintiffs claim that a demand upon the Board of Directors would be futile because a majority of Oxford's Directors have "blatantly violated their fiduciary duties of loyalty and good faith by completely abdicating their responsibility to oversee and monitor the Company's business and by knowingly or recklessly misrepresenting Oxford's financial results to its shareholders and the public." Plaintiffs' Memorandum of Law at 10. Specifically, the Complaint alleges numerous breaches of fiduciary duty, intentional or as a result of reckless disregard by all Director Defendants acting as a group. Included are allegations of failing to have in place sufficient financial controls and procedures to monitor the planned conversion to a new computer system; failing to implement and enforce procedures to prevent the wholesale appropriation of the Company's information and assets by certain of the Director Defendants (the "Insider Traders") who sold thousands of shares of their personal holdings of Oxford stock during the period of November 6, 1996 though August 20, 1997; knowingly or recklessly disseminating, or permitting to be disseminated, misleading in-

formation to shareholders; and allowing the Company to engage in wholesale improper billing practices and to violate numerous insurance regulations, thereby subjecting the Company to fines, penalties and further investigations. The Complaint also alleges against all Directors a generalized failure or neglect to monitor the activities of management, said to amount to reckless conduct as well as corporate waste.

Defendants, citing various press releases referred to in the Complaint and the Complaint itself, assert that the Directors did not ignore the problems but "immediately took steps to respond to the Company's unexpected and highly publicized problems." Defendants' Memorandum of Law at 2. These steps include but are not limited to the following: in January 1998, the Board formed an Executive Committee to strengthen and enhance the company's ability to manage growth; in February 1998, the Board obtained additional financing from Texas Pacific Group ("TPG"); the Board hired Dr. Norman C. Payson as CEO and added three partners of TPG to the Board; in March 1998, the Board hired Marv Rich as Chief Administrative Officer ("CAO"); in June 1998, the Board hired Yon Yoon Jorden as the new Chief Financial Officer ("CFO"); the Board also hired a new independent auditing firm, Ernst & Young, LLP. *Id.* at 16–17.

The Complaint, read in context with the *Oxford Securities Litigation,* states a claim for breach of fiduciary duty, gross mismanagement and waste. No purpose will be served in describing the claims pleaded in any greater detail at the time. The Court assumes familiarity of the reader with the contents of that pleading in its entire verbosity. We turn to the issue of whether it alleges adequately futility of a prior demand. Most or all of the claims allege nonfeasance, and thus are subject to the *Rales* standard, discussed below.

---

1. Note that Defendants correctly state in their memorandum of law that, under Delaware law, demand futility must be "gauged by the circumstances existing at the time of [the filing of the] derivative suit." *Aronson,* 473 A.2d at 810 (where it was held that Defendants' motion to

dismiss the complaint could not be used as evidence to support a claim of demand futility). The first derivative complaint was filed on December 22, 1997, thus limiting an analysis of demand futility to events occurring before that date.

■ Devised as a suit in equity, the purpose of the derivative action was to place in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of "faithless directors and managers." *Kamen v. Kemper*, 500 U.S. at 96, 111 S.Ct. 1711 (citing *Ross v. Bernhard*, 396 U.S. 531, 534, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970)). "A stockholder is not powerless to challenge director action which results in harm to the corporation. The machinery of corporate democracy and the derivative suit are potent tools to redress the conduct of a torpid and unfaithful management." *Aronson v. Lewis*, 473 A.2d at 811. In such instances, stockholders often do not make a demand on the board of directors, and instead file suit claiming that demand is excused. *Rales v. Blasband*, 634 A.2d at 933. Demand as a precondition to suit is required, unless excused for "extraordinary conditions." *Ross v. Bernhard*, 396 U.S. at 534, 90 S.Ct. 733.

■ The purpose of the demand requirement is to "afford the directors an opportunity to exercise their reasonable business judgment and waive a legal right vested in the corporation in the belief that its best interests will be promoted by not insisting on such right." *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 533, 104 S.Ct. 831, 78 L.Ed.2d 645 (1984)(quoting *Corbus v. Alaska Treadwell Gold Mining Co.*, 187 U.S. 455, 463, 23 S.Ct. 157, 47 L.Ed. 256 (1903)). It also permits the corporation to have a first "opportunity to rectify an alleged wrong without litigation, and to control the course of any litigation which does arise." *Aronson v. Lewis*, 473 A.2d at 809.

■ Plaintiffs' allegations that demand would be futile are found in ¶¶ 149–165 of the Complaint. Summarized briefly, Plaintiffs allege that it would be futile to require Plaintiffs to issue a demand to the Director Defendants requesting them to take action against themselves and highly placed executives of the company who are under their direct management, to recover damages for their own intentional or reckless misconduct. The Complaint points out that to do so would require them to investigate and bring claims against themselves, and that their actions to date "prove conclusively that they will not take action." Second Amended Derivative Complaint at p. 64. As of the date of the filing of the original Complaint, all of the Director Defendants except Mr. Wiggins remained in office. The pleading points out (¶ 151) that the misconduct was largely, if not entirely, a situation of intentional nonfeasance and acquiescence with knowledge of management's "repeated misrepresentations to the financial markets regarding the extent and likely duration of [Oxford's] financial crisis." *Id.* at p. 65. Plaintiffs also allege that "a majority of the Director Defendants cannot be presumed to exercise independent judgment in assessing the merits of a demand due to their personal and financial interest in the subject matter of the claims raised." *Id.*

The Complaint continues to point out in ¶ 152 that the Director Defendants were aware of the problems and (¶ 153) "despite their knowledge of these facts intentionally caused Oxford to continue its rapid and aggressive campaign of growth without reasonably insuring themselves that fundamental measures were undertaken and controls put in place to ensure the company was accurately keeping account of and reporting its financial results, and otherwise complying with its legal and regulatory obligations." *Id.* at p. 66.

Motivation for this course of conduct is alleged in ¶ 154 in that the Directors "feared that taking the drastic actions necessary to address the controls crises" would harm the market price of Oxford's stock, result in increased regulatory oversight and intervention, slow the growth of the company, and jeopardize their personal and financial interests as well as their personal ties to Mr. Wiggins. *Id.* at p. 66.

Paragraph 155 alleges further grounds of futility which consist essentially of a summary of the prior allegations and points out a substantial severance package awarded to Mr. Wiggins after the Directors knew of his responsibility for the alleged problems. The Complaint goes on to summarize in detail regulatory actions by the Governor of New York and the Superintendent of Insurance of New York in early 1998, and the fact that the Directors continued thereafter to support and retain Mr. Wiggins as a consultant. *See*

Second Amended Derivative Complaint at p. 67. This strong personal loyalty to Mr. Wiggins on the part of the Directors is alleged to have caused the Defendant Directors to "demonstrate their unwillingness." The Complaint goes on in detail to describe a failure on the part of Oxford to address physician concerns, the filing of legal actions against it by the New York County Medical Society, the public expression adverse to the Directors made by the Attorney General of New York, and some other historical events which seem to this Court somewhat remote from the issue of whether a demand limited to the subject matter of this case would be futile. *Id.* at p. 69.

The Complaint points out that two of the Director Defendants sold Oxford stock while in possession of material non-public adverse information and that another received substantial annual contract payments through the grace and favor of the Board. *Id.* at p. 70 (¶ 163). These events are also said to have caused the Directors involved to lose whatever independence or disinterested status they may have had. As their last argument Plaintiffs point out the continued failure of Oxford or its Board to take action since the claims sued upon have become known.

This Court concludes that the Complaint has made a compelling case in support of the contention of Plaintiffs that it would have been futile to require plaintiffs to issue a demand to the Director Defendants requesting them to take action against themselves and certain senior Oxford executives for their intentional or reckless conduct as alleged. Not only would this require them to investigate and bring clams against themselves for their own misconduct, and the totality of their actions to date suggest most strongly that they will not take action, and would not have done so as of December 22, 1997, which is the relevant date to gauge futility.

As noted earlier, the requirement for pre-suit demand on a company's board of directors is an essential part of the public policy of the State of Delaware, and is a rule of law which is substantive and not procedural. In Delaware there is no one test used to determine demand futility, since the issue is fact intensive and no two cases are alike. To the extent that our decision may be guided by reported cases, there appear to be two separate lines of authority, one for misconduct by the officers and directors, and another for mere nonfeasance. The Complaint contains allegations both of affirmative misconduct and nonfeasance, although it does appear that the claims based on Board inaction probably predominate. In determining futility, however, the entire course of action and inaction followed by the Defendants must be considered, including but not limited to the insider trading which accompanied the alleged nonfeasance.

The leading authority in Delaware is found in *Aronson v. Lewis,* 473 A.2d 805, which deals primarily with management wrongdoing, and *Rales v. Blasband,* 634 A.2d 927, relating to wrongdoing arising primarily out of inaction, or a failure to discharge the Board's responsibility to supervise and monitor the conduct of the affairs of the corporation appropriately, as required under § 141 of the Delaware General Corporation Law.

■ In *Aronson* the Supreme Court of Delaware held that, "[i]n our view demand can only be excused where facts are alleged with particularity which create a reasonable doubt that the directors' action was entitled to the protections of the business judgment rule." 473 A.2d at 808. The *Aronson* court points out that the issues of demand futility rest upon the allegations of the complaint and that the test of futility has long been recognized as "whether the Board, at the time of the filing of the suit, could have impartially considered and acted upon the demand." *Id.* at 809 (citations omitted). *Aronson* recognizes that to establish demand futility in a case involving action, the plaintiff "need not allege that the challenged transaction could never be deemed a product of business judgment." *Id.* The protections of the business judgment rule can only be claimed by disinterested directors whose conduct otherwise meets the test of business judgment and that the directors thus cannot "appear on both sides of the transaction nor expect to derive any personal financial benefit from it." *Id.* at 812. Essentially, the liability is based upon concepts of gross negligence, and the business judgment rule "[t]echnically speaking ... has no role where

directors have either abdicated their functions, or absent a conscience decision, failed to act." *Id.* at 813.

■ *Aronson* stands for the principle long held by the Delaware courts that where board interest, approval or acquiescence in the wrongdoing exists the demand is excused as futile, and that where officers and directors are under an influence which "sterilizes their discretion, they cannot be considered proper persons to conduct litigation on behalf of the corporation," and here again demand would be futile. *Id.* at 814. The clear holding of *Aronson* is that in determining demand futility, this Court "in the proper exercise of its discretion must decide whether under the particularized facts alleged a reasonable doubt is created that: (1) the directors are disinterested and independent; and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Id.*

The *Rales* case, relating substantially to nonfeasance and failure to supervise and monitor the conduct of management, distinguishes a nonfeasance case from the rule of *Aronson,* and holds that:

a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint if filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand. If the derivative plaintiff satisfies this burden, then demand will be excused as futile.

634 A.2d at 934. Furthermore, the *Rales* court rejected the contention that there must be a demonstration in the pleadings of a reasonable probability of success on the merits.

Insofar as concerns the nonfeasance by the Directors, that is to say *their violation of their fiduciary duty to discharge their supervisory and monitoring responsibilities,* reasonable doubt as to futility has been established in accordance with the standard of *Rales.* *See also In Re Caremark International, Inc.,* 698 A.2d 959, 972 (Del.Ch.1996)(holding that a violation of fiduciary duty exists if the directors "either lack good faith in the exercise of their monitoring responsibilities or permitted a known violation of law by the corporation to occur."). A lack of good faith, according to the *Caremark* case can be established by showing a sustained or systematic failure to exercise oversight and assure adequate record keeping. In numerous cases where liability is based upon a failure to supervise and monitor, and to keep adequate supervisory controls in place, demand futility is ordinarily found, especially where the failure involves a scheme of significant magnitude and duration which went undiscovered by the directors. *See Miller v. Schreyer,* 200 A.D.2d 492, 606 N.Y.S.2d 642 (1st Dept.1994) and 257 A.D.2d 358, 683 N.Y.S.2d 51, 55 (1st Dept.1999)(applying Delaware law).

This Complaint alleges with particularity the reckless failure of these defendants upon whom demand to sue would have to be made, in supervising or monitoring the affairs of the company. A portion of the Complaint arises out of allegations of misconduct in connection with the knowing or reckless issuance of materially false statements concerning financial results and operations of the company. Here, since the same persons who claim entitlement to pre-suit demand are the very same persons who acted, pre-suit demand is ordinarily excused. Such knowledgeable or reckless conduct may be inferred from contrasting the actual facts with the public statements claimed to be misleading.

The *Aronson* case teaches violations of the law concerning the dissemination of false and misleading financial statements cannot be deemed to be the product of a valid exercise of business judgment, and therefore protected from a demand futility allegation by the case law. 473 A.2d 805. To the extent that a Defendant violated his or her fiduciary duty by allowing others to make materially false or misleading statements about Oxford's financial matters, the rule of *Rales* applies, and, as previously discussed, demand is excused.

Under these circumstances it appears unnecessary for the Court to address the issue of the independence or disinterestedness of the Directors individually as of the time the suit was filed. Doubtless, participation in insider trading during the relevant period

would create a reasonable doubt concerning the disinterestedness of any Director, and knowledge of or participation in the actions of a friend and colleague in doing so, as well as participation in the extravagant severance arrangements tended to Mr. Wiggins would bear adversely on the independence or disinterestedness of most or all of the Directors. The insider trading was brisk, and occurred during a limited time period. On the totality of the circumstances it appears to represent joint action or action where each insider trader had actual or constructive knowledge of the actions of the others. It is frivolous to argue that these Directors are not disabled from evaluating similar or identical claims against their colleagues, to the extent that this argument is urged to refute the allegation of futility. As noted earlier, demand futility is essentially a factual issue and as to these facts, demand upon the Board would be futile, and is thus excused.

Of considerable interest is the recent opinion of Judge Walls *In re Cendant Corporation Derivative Action Litigation,* 189 F.R.D. 117 (D.N.J.1999). There, applying the rules of *Aronson* and *Rales* in a case involving falsified financial statements followed by insider trading, complicated by a failure to maintain corporate financial records in compliance with GAAP, Judge Walls considered whether the allegation of demand futility in the complaint was adequate. Arguments made in this case resonate in the *Cendant* opinion. The *Cendant* Court held that Plaintiff had rebutted the presumption of director disinterest and independence, that there was a reasonable doubt as to the disinterestedness or independence of the majority of the directors in office at the time the Complaint was filed, and that a demand was futile. 189 F.R.D. 117 at 129. So it is in this case.

Excusing demand in this case does not violate the underlying reasons for requiring demand as a matter of policy. "Because the derivative action impinges on the managerial freedom of the directors," the demand requirement "exists at the threshold, first to insure that a stockholder exhausts his intracorporate remedies, and then to provide a safeguard against strike suits." *In re Cendant,* 189 F.R.D. at 128 (quoting *Aronson,* 473 A.2d at 811–812). Clearly this is not a strike suit; it is an appendage or outgrowth of a large, non-frivolous federal securities class action. In any event, "strike suit" is really no more than a pejorative term; strike suits exist today only in the eyes of the beholder. The tremendous expense of modern litigation coupled with an attorney's potential loss of reputation in today's highly competitive legal profession has rendered "strike suits" obsolete. Such suitors lose their cases and eat their disbursements.

■ Finally, the Court finds no merit in Defendants' argument that Plaintiffs have an irreconcilable conflict of interest because there is no indication that Plaintiffs have removed themselves by opting out of the shareholder classes that are suing Oxford and its directors in the consolidated federal securities action. Defendants cite as authority the cases of *Ryan v. Aetna Life Ins. Co.,* 765 F.Supp. 133 (S.D.N.Y.1991)(Leisure, J.), and *Brickman v. Tyco Toys, Inc.,* 731 F.Supp. 101, 108 (S.D.N.Y.1990)(Carter, J.).[2] In both *Ryan* and *Brickman,* the derivative plaintiff was also a proposed class representative in the direct action. Here, Plaintiffs are passive, non party members of the class in the direct action, having no participation in or control over its conduct, and therefore the Court finds no conflict of interest.

Defendants' motion to dismiss is denied.

SO ORDERED.

---

2. Judges of coordinate jurisdiction are not bound by each others' rulings, but are free to disregard them if they so choose. If there is a federal district court standard, it must come from the Court of Appeals, not from the over 40 district court judges in the Southern District of New York, each of whom sits alone and renders decisions not binding on the others. *Gasperini v. Center For Humanities, Inc.,* 518 U.S. 415, 430 n. 10, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996).