**In re GOLDMAN SACHS MORTGAGE; SERVICING SHAREHOLDER DERIVATIVE LITIGATION.**

**This Document Relates To: All Actions.**

**No. 11 Civ. 4544(WHP).**

United States District Court, S.D. New York.

Aug. 14, 2012.

Brian Dale Brooks, Smith Segura & Raphael, LLP, New York, N.Y. for Plaintiff.

Benjamin Robert Walker, Sullivan & Cromwell, LLP, New York, N.Y. for Defendants.

## MEMORANDUM & ORDER

WILLIAM H. PAULEY III, District Judge.

Plaintiffs Michael G. Brautigam ("Brautigam") and the Retirement Relief System of the City of Birmingham, Alabama ("Alabama Retirement Relief System," with Brautigam, "Plaintiffs") bring this consolidated shareholder derivative action on behalf of nominal defendant The Goldman Sachs Group ("Goldman") against current and former members of Goldman's board of directors and other Goldman executives ("Defendants"). Defendants move to dismiss the Verified, Consolidated and Amended Shareholder Derivative Complaint ("Complaint") in its entirety. For the following reasons, Defendants' motion to dismiss is granted.

## BACKGROUND

### I. The Defendants

Goldman is a Delaware corporation and provides diverse financial services. (Compl. ¶ 7.) In 2007, Goldman entered the loan servicing business when it purchased Litton Loan ("Litton"), a company specializing in servicing high-risk mortgages. (Compl. ¶ 38.) Goldman's purchase of Litton made Goldman the twenty-third largest loan servicer in the country. (Compl. ¶¶ 38, 39.)

Defendants Lloyd C. Blankfein, Gary D. Cohn, John H. Bryan, Claes Dahlback, Stephen Friedman, William W. George, James A. Johnson, Lois D. Juliber, Lakshmi N. Mittal, James J. Schiro, Debra L. Spar, Ruth J. Simmons, and Rajat Gupta ("Director Defendants") are current or former directors of Goldman. Defendant Larry B. Litton, Jr. was president of Lit-

ton after Goldman acquired the firm. Defendant David Viniar is Goldman's Executive Vice President and Chief Financial Officer (collectively, with Director Defendants and Larry B. Litton, Jr., "Individual Defendants").

## II. *Goldman's Loan Servicing Business and TARP*

In October 2008, Goldman entered the Troubled Asset Relief Program ("TARP"), and received $10 billion from the federal government ("TARP Funds"), (Compl. ¶ 41.) As a condition of receiving TARP Funds, Goldman adopted restrictions on executive compensation until it repaid those funds. (Compl. ¶ 47.)

As an additional condition, Goldman participated in the Home Affordable Modification Program ("HAMP"). (Compl. ¶ 42.) HAMP required participants to modify loans for eligible borrowers to allow those borrowers to reduce their monthly mortgage payments. (Compl. ¶ 42.) Plaintiffs allege that Goldman did not commit sufficient resources and personnel to comply with HAMP. (Compl. ¶ 97.) For example, borrowers complained that Litton employees were unresponsive to inquiries and generally unwilling to help. (Compl. ¶ 97.) Plaintiffs also allege that Litton employees fraudulently signed, or "robo-signed," thousands of foreclosure documents without checking their accuracy. (Compl. ¶ 103.)

In February 2009, Goldman settled with homeowners in a certified class action lawsuit alleging violations of the Real Estate Settlement Procedures Act ("the *Schaffer* Settlement"). (Compl. ¶ 118.) Plaintiffs in that class action alleged that Litton improperly imposed late fees on borrowers. (Compl. ¶ 118.) In March 2009, the Congressional Oversight Panel issued a report stating that loan servicers were not responding to borrowers' requests for loan modifications. (Compl. ¶ 52.)

On June 15, 2009, the U.S. Department of Treasury created the Office of the Special Master for TARP Executive Compensation. (Compl. ¶ 49.) That office was tasked with reviewing compensation structures and payments for the five senior executive officers and the next twenty most highly paid employees of TARP recipients. (Compl. ¶ 49.) On June 17, 2009, Goldman repaid the TARP Funds early and freed itself from TARP's compensation restrictions. (Compl. ¶ 93.) Plaintiffs allege that Goldman was more concerned with executive compensation than borrowers' interests. (Compl. ¶ 94.)

In March 2011, government regulators, including state attorneys general and the Justice Department, gave Goldman and other large mortgage loan servicers a settlement term sheet (the "Servicer Settlement Demand"). (Compl. ¶ 58.) The Servicer Settlement Demand provided a list of remedial steps for the loan servicers to take, including maintaining adequate staffing, implementing minimum experience and educational requirements for staff, and considering principal reductions for loan modifications. (Compl. ¶ 59.) Later that month, "several large banks" offered a counterproposal to the Servicer Settlement Demand, which rejected "key" remedies, such as reducing principal in loan modifications. (Compl. ¶ 60.)

Concurrently, the Federal Reserve Bank of New York (the "New York Fed") began investigating Litton's loan modification efforts. (Compl. ¶¶ 60, 105.) In September 2011, the New York Fed and Goldman entered into a consent order. (Compl. ¶ 106.) The New York Fed accused Goldman of engaging in, *inter alia*, "a pattern of misconduct and negligence relating to deficient practices in residential mortgage loan servicing and foreclosure processing."

(Compl. ¶ 106.) The consent order required Goldman to hire an independent consultant to review Litton's foreclosures and provide remediation to borrowers who were financially injured by Litton's practices. (Compl. ¶ 107.)

Recently, Goldman sold Litton to Ocwen Financial Corporation ("Ocwen") and agreed to retain liability for any penalties that the Government imposes because of Litton's foreclosure and servicing practices. (Compl. ¶¶ 7, 109.)

### III. *Goldman's Residential Mortgage–Backed Securities Business*

Between 2005 and 2007, Goldman expanded its mortgage-backed securities business. (Compl. ¶ 64.) By 2006, Goldman had sponsored $162 billion worth of residential mortgage-backed securities ("RMBS"). (Compl. ¶ 64.) Between September 2005 and October 2009, Goldman sold $11.1 billion worth of RMBS to Fannie Mae and Freddie Mac. (Compl. ¶ 67.)

Plaintiffs allege that Goldman knew that loans underlying the RMBS it sold were troubled and falsely represented that the loans complied with particular underwriting standards. (Compl. ¶ 112.) Goldman allegedly knew that the loans did not comply with underwriting standards because Goldman conducted due diligence on the loans prior to securitization. (Compl. ¶ 111.) Plaintiffs point to the fact that Goldman, by purchasing credit default swaps ("CDS") on the RMBS it sold, bet that the loans underlying the RMBS would default. (Compl. ¶ 68.) Fannie Mae, Freddie Mac, and others sued Goldman for violations of federal securities laws arising from these alleged misrepresentations. (Compl. ¶¶ 114–15.) Plaintiffs also allege that Defendants knew from various sources, including their own internal reporting structures, about the decline of the residential mortgage industry and the deteriorating quality of subprime mortgages. (Compl. ¶¶ 69–89.)

Plaintiffs claim that the Individual Defendants breached their fiduciary duty of loyalty when they (1) caused Goldman to accept TARP Funds but then failed to comply with conditions for accepting it; (2) allowed Litton employees to engage in "robo-signing"; and (3) caused Goldman to include troubled loans in its RMBS. Plaintiffs also assert claims for contribution and indemnification against the Individual Defendants.

### DISCUSSION

#### I. *Standard of Review*

On a motion to dismiss, a court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in plaintiff's favor. *See Grandon v. Merrill Lynch & Co.,* 147 F.3d 184, 188 (2d Cir.1998). Nonetheless, "factual allegations must be enough to raise a right of relief above the speculative level, on the assumption that all of the allegations in the complaint are true." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (requiring plaintiff to plead "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [his claim]"). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937 (citation omitted). "A court ruling on such a motion may not properly dismiss a complaint that

states a plausible version of the events merely because the court finds a different version more plausible." *Anderson News, LLC, et al. v. Am. Media Inc., et al.*, 680 F.3d 162, 185 (2d Cir.2012). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937. (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955). A court's "consideration [on a motion to dismiss] is limited to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Allen v. WestPoint–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991).

## II. *Duty of Loyalty Claims*

### A. *Demand*

■ A shareholder's right to "prosecute a derivative suit is limited to situations where the [shareholder] has demanded that the directors pursue the corporate claim and they have wrongfully refused to do so or where demand is excused because the directors are incapable of making an impartial decision regarding such litigation." *Rales v. Blasband*, 634 A.2d 927, 932 (Del.1993); *see also Fink v. Weill*, No. 02 Civ. 10250(LTS), 2005 WL 2298224, at *3 (S.D.N.Y. Sept. 19, 2005). Here, because Goldman is a Delaware corporation, Delaware law governs the issue of whether demand is excused. *See Rahbari v. Oros*, 732 F.Supp.2d 367, 376 (S.D.N.Y.2010) (applying law of state where nominal defendant is incorporated when analyzing whether demand is excused). Federal Rule of Civil Procedure 23.1 requires that the complaint "allege with particularity" why demand is excused. *Fink*, 2005 WL

2298224, at *3. "Because Rule 23.1 requires that Plaintiff make particularized allegations, it imposes a pleading standard higher than the normal standard applicable to the analysis of a pleading challenged under Rule 12(b)(6)." *Fink*, 2005 WL 2298224, at *3. Accordingly, "[v]ague or conclusory allegations do not suffice to challenge the presumption of a director's capacity to consider demand." *In re infoUSA, Inc. S'holders Litig.*, 953 A.2d 963, 985 (Del.Ch.2007).

■ Where a plaintiff bases its complaint on board action, demand is excused if "under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Aronson v. Lewis*, 473 A.2d 805, 814 (Del.1984). If a plaintiff "can demonstrate a reasonable doubt as to the first or second prong of the *Aronson* test, then he has demonstrated that demand would have been futile." *Seminaris v. Landa*, 662 A.2d 1350, 1354 (Del.Ch.1995).

■ Where a plaintiff bases its complaint on board inaction, the analysis focuses on the first prong of *Aronson. See In re Am. Int'l Grp., Inc. Derivative Litig.*, 700 F.Supp.2d 419, 430–31 (S.D.N.Y.2010). Thus, demand is excused if "particularized factual allegations ... [in the] complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Rales*, 634 A.2d at 934. The parties disagree about whether Plaintiffs base their Complaint on board action or inaction, and accordingly, whether *Aronson* or *Rales* applies. Under either analysis, however, demand is not excused.

A court must assess demand futility with respect to the board of directors as of the time the plaintiff filed its complaint. *See Braddock v. Zimmerman,* 906 A.2d 776, 785 (Del.2006); *see also In re Citigroup Inc. S'holder Derivative Litig.,* 788 F.Supp.2d 211, 213 (S.D.N.Y.2011), Thus, the relevant board members for demand purposes are Defendants Blankfein, Bryan, Cohn, Dahlback, Friedman, George, Johnson, Juliber, Mittal, Schiro, and Simmons ("the Board Defendants").

### B. *Waiver of Demand Futility*

As a threshold matter, the parties dispute whether an April 2010 letter that Brautigam sent to Goldman's then-board of directors constitutes a demand and is therefore a concession that demand is not futile ("Brautigam Letter"). (Declaration of Benjamin R, Walker, dated Jan. 31, 2012 ("Walker Decl.") Ex. A.) "A shareholder who makes a demand can no longer argue that demand is excused." *Spiegel v. Buntrock,* 571 A.2d 767, 775 (Del.1990). Courts apply "a test analogous to *res judicata* to determine whether [a] demand letter conceded that demand was required for all legal theories arising out of the set of facts described in the demand letter." *Grimes v. Donald,* 673 A.2d 1207, 1219 (Del.1996), *overruled on other grounds by Brehm v. Eisner,* 746 A.2d 244 (Del.2000). *Res judicata* "bars a party from litigating the same cause of action after a judgment has been entered in a prior suit involving the same parties." *Aveta Inc. v. Cavallieri,* 23 A.3d 157, 179 (Del.Ch.2010). "[T]he cause of action must be the same in both cases or the issues decided in the prior action must be the same as those raised in the present case...." *Aveta,* 23 A.3d at 179.

The Brautigam Letter does not constitute a demand for purposes of this action because it complained of conduct that is wholly dissimilar from what Plaintiffs allege here. The Brautigam Letter claimed that the board of directors failed adequately to supervise Fabrice Tourre ("Tourre"), a Goldman vice president, in connection with "structuring and marketing the synthetic collateralized debt obligations known as ABACUS 2007–ACI." (Walker Decl. Ex. A at 1.) As a result of Tourre's actions, the Securities and Exchange Commission ("SEC") filed suit against Goldman and Tourre. The Complaint does not even mention Tourre or ABACUS 2007–ACI. Rather, as discussed above, Plaintiffs base their Complaint on Goldman's non-compliance with conditions for accepting TARP Funds, the practice of "robo-signing," and the inclusion of troubled loans in RMBS.

Moreover, Defendants previously attempted to transfer Brautigam's lawsuit to another district judge presiding over an action based on Goldman's failure to supervise Tourre. (*See Brautigam v. Blankfein et al.,* 11 Civ. 4544, ECF No. 9.) This Court denied Defendants' application, stating that the cases were "entirely different." (*Brautigam,* 11 Civ. 4544, ECF No. 9.) Accordingly, the Brautigam Letter is not a pre-suit demand conceding that demand is futile.

### C. *Director Interest*

"A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders." *Rales,* 634 A.2d at 936; *see also Aronson,* 473 A.2d at 812. "Directorial interest also exists where a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders. In such circumstances, a director cannot be expected to exercise his ... independent business judgment without being influ-

enced by the adverse personal consequences resulting from the decision." *Rales*, 634 A.2d at 936. "Reasonable doubt as to the board's ability to exercise its business judgment can be established by alleging that the members of the board faced a substantial risk of personal liability as a result of the suit." *Rahbari*, 732 F.Supp.2d at 378. But "the mere threat of personal liability" is insufficient to challenge the disinterestedness of directors. *Rales*, 634 A.2d at 936. It is a rare case " 'where defendants' actions were so egregious that a substantial likelihood of director liability exists.' " *Rahbari*, 732 F.Supp.2d at 378 (quoting *Seminaris v. Landa*, 662 A.2d 1350, 1354 (Del.Ch. 1995)).

Plaintiffs argue that Blankfein and Cohn are interested because aside from being directors, they are also Goldman officers. *See In re Goldman Sachs Group., Inc.*, No. 5215–VCG, 2011 WL 4826104, at *7 (Del.Ch. Sept. 7, 2011). Assuming, *arguendo*, that Blankfein and Cohn are interested, they represent only two of eleven Board Defendants. And Plaintiffs fail to raise a reasonable doubt as to a majority of the Board Defendants' disinterestedness.

■ Plaintiffs allege that the remaining Board Defendants face a substantial likelihood of liability because they breached their duty of loyalty by failing to act in good faith. "The failure to act in good faith may result in liability because the requirement to act in good faith is a subsidiary element, i.e., a condition, of the fundamental duty of loyalty." *Stone v. Ritter*, 911 A.2d 362, 369–70 (Del.2006) (internal quotation marks and alterations omitted). "A failure to act in good faith may be shown ... where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts

with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties." *Ritter*, 911 A.2d at 369. "[T]here is a vast difference between an inadequate or flawed effort to carry out fiduciary duties and a conscious disregard for those duties." *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del.2009). "Directors' decisions must be reasonable, not perfect." *Lyondell*, 970 A.2d at 243.

■ Plaintiffs theorize that Goldman has a robust governance structure and therefore, that the Board Defendants must have been aware that Goldman's mortgage servicing business lacked adequate resources and procedures to handle the soaring number of defaults. For the same reason, Plaintiffs assert that the Board Defendants must have known that Litton employees were "robo-signing" affidavits. Plaintiffs also rely on the fact that Defendants Bryan, Dahlback, Friedman, George, Johnson, Juliber, Mittal, and Schiro served on various standing committees, which informed them of problems at Litton.

Plaintiffs rely on *In re Countrywide Financial Corp., Derivative Litigation*, 554 F.Supp.2d 1044, 1082 (C.D.Cal.2008), for the propositions that (1) demonstrating a robust governance structure is sufficient to plead that directors knew of employees' wrongful conduct and (2) pleading membership on a standing committee is sufficient to demonstrate that a director must have known about illegal or improper activity within a company. But Plaintiffs misread that decision. *Countrywide* excused demand because plaintiffs pointed to specific "red flags of such prominence that [defendants] must necessarily have examined and considered them in the course of their committee oversight duties." 554 F.Supp.2d at 1082; *see also Am. Int'l Grp.*, 700 F.Supp.2d at 437–38 (distinguishing

*Countrywide* because plaintiffs failed to plead particularized facts alleging that defendants, "in the course of carrying out their responsibilities as Board members generally or as Board committee members particularly, would have become aware of any 'red flags' demonstrating serious risks at the core of AIG's business"); *La. Mun. Police Ret. Sys. v. Pandit,* No. 08 Civ. 7389(LTS), 2009 WL 2902587, at *8 (S.D.N.Y. Sept. 10, 2009) (finding defendants did not face a likelihood of liability where there was a reporting system in place but no allegations of red flags other than notice of general deterioration of financial markets).

Plaintiffs allege no such red flags that would alert the Board Defendants of broken controls in Goldman's mortgage servicing business. *In re Abbott Laboratories Derivative Shareholders Litigation,* 325 F.3d 795 (7th Cir.2001), on which Plaintiffs also rely, is distinguishable because plaintiffs there pled "an extensive paper trail" demonstrating defendants' awareness of various FDA violations. 325 F.3d at 808–09 (facts raised inference of conscious disregard of duties when FDA met with company representatives at least ten times concerning continuing violations); *see also Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Stumpf,* No. C 11–2369 SI, 2012 WL 424557, at *6 (N.D.Cal. Feb. 9, 2012) (directors faced a substantial likelihood of liability where they claimed that internal controls were effective but knew of significant problems with internal controls). Plaintiffs do not plead a comparable paper trail here. And any contention that membership on a standing committee is sufficient to establish a likelihood of liability is simply contrary to established law. *See, e.g., Rahbari,* 732 F.Supp.2d at 386; *Wood v. Baum,* 953 A.2d 136, 142–43 (Del.2008) (rejecting argument that because "certain board members served on an audit committee" they "should have been aware of the facts on which" plaintiff based his complaint).

Moreover, the court in *Countrywide* reasoned that committee members must have known about widespread underwriting deficiencies because those practices concerned "the very core of Countrywide's business model." 554 F.Supp.2d at 1082 n. 42. Here, Plaintiffs do not allege that Litton was central to Goldman's business operations. Indeed, at oral argument, Plaintiffs' counsel conceded that Litton comprised only a small percentage of Goldman's revenue. (Transcript of Hearing, dated Apr. 30, 2012 ("Hr'g Tr.") at 23:21–22.) While Plaintiffs allege that Viniar reported that Goldman purchased Litton to help "take advantage of the distressed environment," this does not suggest that Litton was so integral to Goldman's business that the Board Defendants must have been attuned to its operational problems. *See Countrywide,* 554 F.Supp.2d at 1082 n. 42; *see also Am. Intl. Grp.,* 700 F.Supp.2d at 437 (directors did not face substantial likelihood of liability where it was "inconsistent to the scale and scope" of company for directors to be aware of particular issue).

Additionally, Plaintiffs' argument that Blankfein, Bryan, Cohn, Dahlback, Friedman, George, Johnson, Juliber, and Mittal face a substantial likelihood of liability because they were directors when Goldman entered into the *Schaffer* Settlement also fails. The Complaint alleges no facts suggesting that the settlement resulted from these defendants' wrongdoing. And Plaintiffs fail to cite a single case in which a court found that the mere fact of a settlement posed a substantial likelihood of liability for directors. Plaintiffs' argument that the Board Defendants face a substantial likelihood of liability because of their receipt of the Servicer Settlement demand fails for similar reasons. Again, there is

no allegation that the Board Defendants' action or inaction resulted in Goldman rejecting the Servicer Settlement.

Plaintiffs' allegations that the Board Defendants caused troubled loans to be included in Goldman's RMBS similarly fail because Plaintiffs cannot point to specific red flags that would have alerted the Board Defendants to this practice. In pleading "red flags," Plaintiffs allege that the Board Defendants heard various presentations concerning the troubled mortgage market. But these "types of general warnings about difficulties in a sector of the financial markets" are "insufficient" to put the Board Defendants on notice that Goldman included troubled loans in its RMBS portfolio. *Am. Int'l Grp.*, 700 F.Supp.2d at 437–38 (finding general allegations about trouble in financial markets insufficient to put defendants on alert of company's own exposure to loss).

Plaintiffs also rely on a November 2007 e-mail from Blankfein to Cohn and Viniar, acknowledging Goldman's practice of "shorting" the RMBS it sold. Plaintiffs theorize that "shorting" proves that the Board Defendants knew that Goldman included troubled loans in the RMBS. Plaintiffs further allege that in 2007, Defendants Blankfein, Bryan, Cohn, Dalback, Friedman, George, Johnson, and Juliber discussed the mortgage crisis and tactical steps Goldman was taking to deal with it, including "shorting." (Compl. ¶ 140.) But again, Plaintiffs do not plead any specific "red flags" that would have alerted these defendants to the fact that Goldman included troubled loans in the RMBS. And courts have generally required a much stronger showing to find that directors face a substantial likelihood of liability. *See e.g., Rahbari*, 732 F.Supp.2d at 385; *see also Countrywide*, 554 F.Supp.2d at 1081–82 (allegations established a substantial likelihood of liability where defendants received two reports of employees not complying with underwriting standards, public report by banking regulators, and where company culture encouraged employees not to comply with underwriting standards).

Additionally, the Delaware Chancery court rejected a similar argument in *In re Goldman Sachs Group., Inc.* In that case, the court addressed whether defendants abrogated their oversight duties by "shorting." *See Goldman Sachs Grp., Inc.*, 2011 WL 4826104, at *19. This Court faces a slightly different question—whether "shorting" is evidence that these defendants knew Goldman included troubled mortgages in its RMBS. Nonetheless, the Delaware decision is instructive because the court reasoned that defendants "exercised their business judgment in choosing and implementing a risk management system that they presumably believed would keep them reasonably informed of the company's business risks." *Goldman Sachs Grp., Inc.*, 2011 WL 4826104, at *23. Thus, the Delaware court did not regard "shorting" as an indication that defendants acted in bad faith. *Goldman Sachs Grp., Inc.*, 2011 WL 4826104, at *23. Plaintiffs offer no explanation why the reasoning in *Goldman Sachs Group, Inc.* should not apply here.

Plaintiffs next allege that the Board Defendants face a substantial likelihood of liability because they allowed Goldman to issue false and misleading representations concerning the characteristics of loans underlying its RMBS. This allegation is insufficient because Plaintiffs do not identify the statements that they claim were misleading. *Citigroup, Inc.*, 964 A.2d 106, 132–33 (2009) (finding that defendants did not face a substantial likelihood of liability for misstatements or omissions where plaintiffs did not identify any disclosure that was misleading). Nor does the Com-

plaint "contain specific factual allegations that reasonably suggest sufficient board involvement in the preparation of the disclosures that would allow [this Court] to reasonably conclude that the director defendants face a substantial likelihood of personal liability." *Citigroup, Inc.*, 964 A.2d at 134. Accordingly, Plaintiffs have not alleged sufficient facts giving rise to a reasonable doubt that a majority of the Board Defendants were disinterested.

## D. *Director Independence*

This Court again assumes for the sake of argument that Blankfein and Cohn are interested, and accordingly, considers whether Plaintiffs raise a reasonable doubt as to the Board Defendants' independence. *See Rahbari*, 732 F.Supp.2d at 386 n. 23 ("A court must consider whether directors were independent only upon a finding that one or more of the directors is not disinterested."), *see also Brehm*, 746 A.2d at 258 (declining to consider question of independence where plaintiff failed to allege that a single director was interested). "Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Aronson*, 473 A.2d at 816. "[P]laintiffs must point to a relationship that is so substantial that [a] non-interested director would be more willing to risk his … reputation than risk the relationship with the interested director." *In re IAC/InterActiveCorp Sec. Litig.*, 478 F.Supp.2d 574, 600 (S.D.N.Y. 2007) (internal quotation marks omitted); *see also Aronson*, 473 A.2d at 815 (holding that plaintiff must demonstrate that directors were beholden to controlling person).

In their opposition to this motion, Plaintiffs abandon their Complaint's theory that eight of the eleven Board Defen-

dants lacked independence because of "significant financial relationships" with Goldman. (Hr'g Tr. at 21:16–19; Compl. ¶¶ 128–38.) Instead, Plaintiffs now rely solely on the allegation that eight Board Defendants demonstrated their lack of independence when they caused Goldman to repay TARP Funds, thereby lifting onerous executive compensation restrictions. (Compl. ¶¶ 93–95.) And that allegation rests only on the fact that the U.S. Treasury established the Office of the Special Master for TARP Executive Compensation on June 15, 2009, and that two days later, Goldman exited TARP. This allegation is wholly conclusory and does not meet the particularity requirement. *See e.g., Kernaghan v. Franklin*, No. 06 Civ. 1533(LTS)(MHD), 2008 WL 4450268, *9 (S.D.N.Y. Sept. 29, 2008) (plaintiff failed to raise a reasonable doubt about defendants' independence when he did not plead that benefit would accrue to directors as a result of voting against suing company). Indeed, Plaintiffs' allegations are devoid of any facts suggesting that the Board Defendants were beholden to anyone receiving compensation affected by TARP. *Cf. Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1051–52 (Del.2004) (finding plaintiff did not sufficiently plead that defendants were beholden to anyone even where plaintiff alleged that defendants were friends with Martha Stewart). Moreover, this Court cannot construe the decision to repay TARP "as evidence of even a slight inclination to disregard … duties as a fiduciary" because Plaintiffs do not allege that the decision to exit TARP harmed Goldman. *IAC/InterActiveCorp.*, 478 F.Supp.2d at 601 (internal alterations omitted). Accordingly, Plaintiffs fail to raise a reasonable doubt that a majority of the Board Defendants were independent.

### E. *Business Judgment*

 To the extent that Plaintiffs base their Complaint on the Board Defendants' affirmative actions, the Court must analyze these decisions under the second prong of *Aronson*. To demonstrate demand futility under the second prong of *Aronson*, "a plaintiff must plead specific facts to overcome the powerful presumptions of the business judgment rule." *infoUSA*, 953 A.2d at 972 (internal quotation marks omitted). "Specifically, the plaintiffs must plead particularized facts sufficient to raise (1) a reason to doubt that the action was taken honestly and in good faith or (2) a reason to doubt that the board was adequately informed in making the decision." *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 824 (Del.Ch. 2005). The "presumption protects decisions unless they cannot be attributed to any rational business purpose." *infoUSA*, 953 A.2d at 972 (internal quotation marks omitted).

Plaintiffs assert that the following actions were not valid exercises of business judgment: (1) exiting TARP early; (2) causing Goldman to issue false or misleading RMBS registration statements; and (3) selling Litton without repairing its broken controls. *See In re Oxford Health Plans, Inc.*, 192 F.R.D. 111, 117 (S.D.N.Y. 2000) ("[V]iolations of the law concerning the dissemination of false and misleading financial statements cannot be deemed to be the product of a valid exercise of business judgment.").

 First, Plaintiffs do not plead particularized facts suggesting that any of the directors involved in the decision to exit TARP—Defendants Blankfein, Cohn, Bryan, Dahlback, Friedman, George, Johnson, Juliber, Mittal, and Schiro—came to that decision in bad faith or without adequate information. Their allegations concerning the TARP decision are wholly conclusory. (Compl. ¶¶ 44, 47, 93–95, 127.) And Plaintiffs fail to explain how the decision to repay TARP is not tethered to a rational business purpose. *See infoUSA*, 953 A.2d at 972.

The allegation that Defendants "caused" Goldman to issue false and misleading statements is also inadequate. Plaintiffs do not identify which disclosures were misleading. Instead, they allude generally to "registration statements." (*See* Compl. ¶¶ 110–12). "[N]or does the complaint sufficiently allege that the director defendants had knowledge that any disclosures or omissions were false or misleading or that the director defendants acted in bad faith in not adequately informing themselves." *In re Dow Chem. Co. Derivative Litig.*, No. 4349–CC, 2010 WL 66769, at *10 (Del.Ch.2010) (internal quotation marks omitted); *see also Citigroup*, 964 A.2d at 132–33 (no bad faith where complaint did not identify which disclosures were misleading or allege "what the directors knew and when"). "To determine whether the alleged misleading statements were made with knowledge or bad faith requires an analysis of the state of mind of the individual director defendants." *Dow*, 2010 WL 66769, at *10 (internal quotation marks omitted). Plaintiffs offer no such allegations, let alone analysis. They only broadly allege that "Goldman" knew that loans that did not comply with underwriting standards were securitized and included in RMBS sold to Fannie Mae and Freddie Mac. (Compl. ¶ 111.)

Finally, Plaintiffs claim that the decision to sell Litton was not a valid business decision. They allege that Goldman jettisoned Litton without taking corrective action while agreeing to retain liability for any fines imposed for Litton's improper foreclosure and servicing practice. (Compl. ¶ 109.) But again, the Complaint is devoid of particularized factual allega-

tions that any of the defendants acted in bad faith or were not adequately informed in making the decision. *J.P. Morgan Chase*, 906 A.2d at 824. Accordingly, Plaintiffs fail to plead that this decision was not an exercise of valid business judgment.

### III. Contribution and Indemnification

Because Plaintiffs have failed to establish that demand is excused, Plaintiffs' contribution and indemnification claims are also dismissed. *See Sampson v. Robinson*, Nos. 07 Civ. 6890(PAC), 07 Civ. 5867(PAC), 2008 WL 3884386, at *7 (S.D.N.Y. Aug. 20, 2008) (applying Delaware law and dismissing entire complaint when plaintiffs failed to plead demand futility); *In re Xethanol Corp. Derivative Litig.*, No. 06 Civ. 15536(HB), 2007 WL 2331975, at *7 (S.D.N.Y. Aug. 16, 2007) (same).

### IV. Leave to Amend

█ In their opposition to the motion, Plaintiffs seek leave to amend the Complaint if this Court grants the motion in whole or in part. Rule 15(a) of the Federal Rule of Civil Procedure provides that a court "should freely give leave [to amend] when justice so requires." In construing this rule, the Second Circuit "has indicated that where a plaintiff clearly has expressed a desire to amend, a lack of a formal motion is not a sufficient ground for a district court to dismiss without leave to amend." *Porat v. Lincoln Towers Cmty. Ass'n*, 464 F.3d 274, 276 (2d Cir.2006). However, "[a] counseled plaintiff is not necessarily entitled to [replead] whenever he has indicated a desire to amend his complaint." *Porat*, 464 F.3d at 276. Indeed, the Second Circuit has repeatedly upheld a district court's decision to deny a plaintiff's informal request to amend its complaint when it failed to advise the district court of how an amendment would cure defects in the complaint. *See e.g., Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120, 140 (2d Cir.2011) (upholding district court's decision to deny leave to amend where plaintiff "never indicated ... how further amendment would permit him to cure the deficiencies in the complaint."); *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir.2011) ("[I]n the absence of any indication that Gallop could—or would—provide additional allegations that might lead to a different result, the District Court did not err in dismissing her claim with prejudice."); *Porat*, 464 F.3d at 276 (finding no abuse of discretion where district court denied leave to amend to plaintiff who did not inform the court of how it would cure complaint's defect).

█ Here, Plaintiffs failed to advise this Court of how an amendment would cure defects in the Complaint. And they provide no suggestion that they can plead demand futility. Moreover, this Court held a conference in November 2011, before Plaintiffs filed their amended complaint. At that conference, Defendants described the grounds on which they would move to dismiss. (Transcript of Hearing, dated Nov. 22, 2011 ("Hr'g Tr.") at 12:07–15:2.) Despite that preview, Plaintiffs failed to cure the defects when they filed their amended complaint in January 2012. Accordingly, Plaintiffs' motion to amend is denied.

### CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted, and Plaintiffs' claims are dismissed. Plaintiffs' motion to amend is denied. The Clerk of the Court is directed to terminate the motion pending at ECF No. 45.

SO ORDERED.